BEN F. CONKEY, APPELLANT, V. HANS KNUDSEN, JR., ET AL.:
HENRY FRANCISCO, APPELLANT: JAMES P. GOODFELLOW
ET AL., APPELLEES: JOHN MCGONIGLE ET AL.,
CROSS-APPELLANTS.

4 N. W. (2d) 290

FILED MAY 29, 1942. No. 31217.

*George W. Leamer, M. R. Smith* and *S. W. McKinley, Jr.,* for appellants.

*D. Van Donselaar, Nagelstead, Pizey & Johnson, W. P. Warner, W. V. Steuteville, P. F. Verzani, Richard Twohig* and *McCarthy & McCarthy, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

EBERLY, J.

In this cause are presented appeals by parties in interest from certain judgments entered by the district court for Dakota county, Nebraska, on the 6th and 7th days of January, 1941, determining certain lands in suit to be "an accretion area" and directing division thereof on that basis.

This is the second appearance in this court of an action to quiet title to certain real estate against the following named defendants: Hans Knudsen, Jr., Clara Knudsen, Hans Knudsen, Jack L. Hamp, Lewis W. Newman (who is the same person as L. W. Newman), Maggie Leedom, Pearl M. Sanford, Sene Knudsen, Maude Harris, Harry J. Goodfellow, Martha E. Goodfellow, Otis Wood, "and all persons having or claiming any interest in and to all that part of the accretion land to the southwest quarter of northeast quarter and northwest quarter of southeast quarter of section 13, township 29, range 7 East of the 6th P. M. in Dakota county, Nebraska, more particularly described as follows: (Here follows a description by metes and bounds of the land claimed.)" All parties defendant named in plaintiff's petition were duly summoned either by personal service of summons or duly notified as provided by our Civil Code. Plaintiff also duly filed a *lis pendens* in such proceeding. On February 10, 1938, default was entered against Hans Knudsen, Jr., Clara Knudsen, Lewis W. Newman, Pearl M. Sanford, Maude Harris, Harry J. Goodfellow, and Martha E. Goodfellow, and "all persons having or claiming any interest in and to (lands heretofore referred to), real names unknown." No appeal was ever taken from this judgment or decree determining that the parties last named were in default for pleading, and it has become final. It is also disclosed by the record that in due course of pleading the defendants Hans Knudsen, Sene Knudsen, Maggie Leedom, Otis Wood and Jack L. Hamp filed their respective answers to the petition of plaintiff, taking issue with the allegations thereof. On February 1, 1937, Will Brewer, as an intervener, filed his petition of intervention in this action. On December 31, 1937, Ralph George, as an intervener, filed his petition of intervention in said cause. Both interveners set up alleged rights in the premises in suit and challenged plaintiff's right to recover the premises claimed by him. Intervener Will Brewer, as his answer and cross-petition to the petition of plaintiff, in substance, (1) denies plaintiff's allegation as to plaintiff's actual, adverse pos-

session of the lands described in plaintiff's petition; (2) sets forth his claim of title to a portion of the lands described in plaintiff's petition as an accretion to certain land owned by this intervener, of which he also alleges continuous, open, notorious, adverse possession of the lands described in his cross-petition for more than ten years last past, and prays that title thereto may be quieted in such cross-petitioner. Intervener Ralph George in his answer and cross-petition, in substance, (1) expressly denies that plaintiff or his grantors have ever had continuous, open, notorious, exclusive possession of the lands described in plaintiff's petition; (2) sets forth his claim of title to certain lands described in the cross-petition of said George as and by virtue of the same being a lawful accretion to the lands owned by him and described in his cross-petition, and further alleges adverse possession of such lands so described for more than ten years last past. Each of the aforesaid interveners pray for appropriate relief.

To the pleadings of defendants and cross-petitioners, plaintiff joined issue by filing his replies and answers thereto, all of which in substance contained general denials. After joinder of issues a trial was had in the district court for Dakota county, in which plaintiff, the defendants, and both interveners appeared and participated. Evidence and proof were introduced separately by and in behalf of each and all in support of the allegations set forth and contained in their respective pleadings. On March 31, 1938, a judgment was entered in said cause, which recites:

"On this 31st day of March, 1938, it being a day of the regular February, 1938, term of this court, this cause came on for further hearing, the evidence having been submitted at a previous hearing, and the court being duly advised in the premises finds that as to the defendants Hans Knudsen, Sene Knudsen, Maggie Leedom, Otis Wood and Jack L. Hamp, they have no right to, interest in, or lien upon the property described in plaintiff's petition * * * ; that all the allegations of plaintiff's petition are true as to the above named or designated defendants, and the plaintiff is the

owner of the premises described in his petition and he is entitled to the relief prayed.  * * *  It is therefore ordered, adjudged and decreed by this court that the possession and title of said plaintiff in the following described real estate (specific description follows, which is identical with the lands described in plaintiff's petition) and that all and any part of the same be quieted and the same is hereby quieted and forever confirmed as against the above named and designated defendants and each of them and all persons claiming by, through or under them or any of them, and the plaintiff has the fee simple title in said premises (here follows provision of decree enjoining above named defendants from having or claiming any right to or interest in the above described property) * * * ."

From the judgment thus entered Hans Knudsen, Sene Knudsen, Maggie Leedom and Otis Wood prosecuted an appeal to this court. To that appeal all other defendants, plaintiff, Ben F. Conkey, and interveners Will Brewer and Ralph George were made appellees. This appeal was filed in this court on June 30, 1938. The plaintiff and appellees, including both interveners, cooperated in securing the allowance of the bill of exceptions containing the evidence on which the case was tried and presented to the district court, and appeared in this court in this pending appeal by stipulation duly executed by them. The case was in due course thereupon determined in the supreme court in an opinion by Carter, J., duly adopted by this court on March 10, 1939, and now reported in 135 Neb. 890, 284 N. W. 737, as *Conkey v. Knudsen*, and the judgment entered in the district court was in all respects affirmed.

It will be noted that the judgment thus entered is, as to parties thereto and their privies, final and conclusive, and the same as affirmed by this court was not subject to be reopened, modified or revised by the district court except as by law expressly provided. It was a judgment on the merits, and as such concluded the parties thereto, not only as to the things determined, but as to matters which might have been determined. *Triska v. Miller*, 86 Neb. 503, 125 N. W. 1070.

Indeed, the rule adopted in this jurisdiction appears to be: "A person not a stranger to a judicial proceeding is bound thereby, and the record of such proceeding is admissible in evidence against him. (1 Greenleaf, Evidence [14th ed.] sec. 522.)" *Dorsey v. McGee*, 30 Neb. 657, 46 N. W. 1018.

It thus appears that the determination of the issue of Conkey's adverse possession of the lands in suit was in necessary effect the controlling issue of the litigation. This title based on statutory adverse possession for the requisite period, so established, was necessarily hostile and superior to any right or title to the premises in suit possessed or claimed by the other parties to the judgment, whether as resulting from title deeds or as "accretions" to the real estate owned by them. The title by "adverse possession" adjudicated in Conkey by necessary implication is superior to and wholly invalidates all previously existing claims and titles opposed thereto on which the other parties defendant. to the suit relied, and operated to adjudicate a superior title in fee simple vested in him. As to the appellants Hans Knudsen, Sene Knudsen, Maggie Leedom and Otis Wood, the judgment of March 31, 1938, of the district court for Dakota county quieting title to certain premises in Conkey, as against them, is final and conclusive. They are thereby precluded from claiming any rights whatever in or to such lands and may not invoke the powers of the district court in reference thereto.

However, the last paragraph of this decree of March 31, 1938, recites: "It is further ordered that the hearing, as pertaining to the interveners Will Brewer and Ralph George, be continued until April 18, 1938." But nothing further appears to have been done in this matter until after the decision of the case first herein referred to was announced by the supreme court. The mandate of the supreme court in the foregoing action was in due time transmitted to the district court for Dakota county and entered upon its records. The interrupted hearing pertaining to interveners Brewer and George was thereupon resumed, all of the evidence introduced in the case, which upon appeal had been

determined by the supreme court, was at least by tacit consent of all parties considered as then before the trial court and subject to its consideration. Thereupon on showing made that the lands involved in this proceeding constituted "one accretion area," which at the conclusion of this suit should be apportioned among the respective riparian owners in accordance with their respective ownership of riparian lands to which such accretion formed a part, certain parties were, upon order of the district court, made parties to the proceeding, and ordered served with process. To the making of this order plaintiff, Conkey, objected. However, the order of service of process was complied with. Without reciting the course of pleadings and the amendments thereto, the following in due time became parties to this proceeding and filed pleadings therein containing answers and cross-petitions, viz.: Cornelius K. Heffernan (who died testate after due service of summons made upon him and the action was duly revived and the interests owned and possessed by the deceased in his lifetime, by proper pleadings, presented by his successors in title to the consideration of the district court), James P. Goodfellow, Henry Francisco and Cora Francisco, his wife, Otis Wood, Peter E. Christensen, John McGonigle, Victor McGonigle, Bart McGonigle, Will McGonigle and Leo McGonigle. To the pleadings so filed there were duly filed such answers and replies as were required by the interests of the parties and the state of the pleadings. So it may be said that the issues were properly made up.

The situation presented may best be explained by the annexed map, which is made a part of this opinion. It is prepared from exhibit 105, introduced in evidence by intervener George. It covers the terrain involved in this law suit. The present course of the Missouri river is as delineated thereon. A "hatched line," identified by the letters A, B, C, D, etc., and marked "High Bank," extends from section 11 southerly to section 24, thence easterly in the direction of the present location of the Missouri river. Immediately prior to 1909 and the early days of 1910 the

"hatched line" referred to marked the western and southern bank of that river. The evidence is without substantial contradiction that this bank so indicated was then high, the

main or navigable channel of the river at this point 'was narrow, the current was swift, and the wash was along the western and southern banks. All interveners and other claimants base their claims of riparian rights in and to the so-called accretion area on their ownership of lands west and south of this "High Bank." Their contention is that the channel of the river after 1909 and the early days of 1910 gradually receded eastward and northward exposing the land between the "High Bank" and the present banks of the Missouri river, thus constituting it alluvium accreting to the lands of the defendants and interveners, of which such stream prior to its recession formed a boundary. In consideration of this contention, it may be said that the doctrine of accretion applies to states and nations as well as to individuals unless taken away or modified by treaties or stipulations. It applies to both navigable and nonnavigable streams, and it applies to large rivers like the Mississippi and the Missouri.

In reference to the question presented by this record this court was early committed to the doctrine: "What is an accretion to land? It seems to be a settled doctrine at common law, that an accretion to land is the imperceptible increase thereto on the bank of a river by alluvial formations, occasioned by the washing up of the sand or earth, or by dereliction as when the river shrinks back below the usual water mark; and when it is by addition, 'it should be so gradual that no one can judge how much is added each moment of time.' And when the formation of land is thus imperceptibly made on the shore of a stream, by the force of the water, 'it belongs to the owner of the land immediately behind it, in accordance with the maxim, *de minimis non curat lex.*' It is said that 'no other rule can be applied on just principles,' for the reason that 'every proprietor whose land is thus bounded, is subject to loss by the same means which may add to his territory, and as he is without remedy for his loss in this way, he cannot be held accountable for his gain.' In *Granger v. Swartz,* 1 Woolworth, C. C. R., 91, it is held that, if when the entry of

public land is made, the banks of the river, at any ordinary stage of water, was in fact where the meander line was represented by the survey, and land has since been formed by accretion, it will become the land of the person who has title to the land immediately behind it. *New Orleans v. United States,* 10 Peters, 717." *Lammers v. Nissen,* 4 Neb. 245.

In *Frank v. Smith,* 138 Neb. 382, 293 N. W. 329, the last case pertaining to this subject, we announced the applicable rules thus:

"Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the lowering of its surface level from any cause.

"Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner. * * *

"Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. *Commissioners v. United States,* 270 Fed. 110."

All parties to this proceeding are in substantial agreement that as the Missouri river flowed in 1909 and the early days of 1910 the western and southern boundary of its main and navigable channel was marked by the line A, B, C, D, etc., as it appears on the annexed map, and which is also thereon marked as "High Bank," and that the thread of such channel as it then flowed with its western and southern limits thus situated constituted the true and common boundary lines of the lands situated west and south thereof, and of the lands situated east and north of such main channel. The question presented by this record is the nature and effect of the changes that occurred which resulted in the abandonment of the location of the main or navigable river channel, as last described, and its change to the north and

east so that it now flows as shown on the annexed map north and east of the area in this action alleged to be "an accretion area" and the subject-matter of this litigation.

Indeed, this case turns upon a disputed question of fact. However, a careful consideration of the evidence as an entirety convinces us beyond a reasonable doubt that this change was wholly caused by the formation of an ice gorge in the vicinity of Cisco Point during a season of high waters in the early spring of 1910 in the main or navigable channel then situated along the line A, B, C, D, etc. The result of this gorge was to substantially block and dam the original channel and to force the waters carried by the same to cut a new channel northerly and easterly for more than a mile, which waters then turned southerly and easterly and continued until they intersected the original channel of the Missouri river as it was then situated. As a result, when the freshet was over and the flood waters receded in the spring of 1910 to the ordinary stages of the river, the general situation of the main or navigable channel of the Missouri river was then flowing in a new channel as shown on the annexed map as its present location. At ordinary stages of the river the evidence fails to show that it ever returned to the main or navigable channel occupied in 1909. Really the evidence on this point is without substantial contradiction.

Willard Bacon, an engineer, testifying in reference to this alleged accretion, says, in part: "Q. You don't presume to say whether that is land made to the riparian banks by accretion or avulsion? A. No, I don't. I don't know definitely. Q. When you made this plat you placed on the plat a hatched line which you have designated as a high bank? A. Yes. Q. That, I assume, was the one time high bank of the Missouri river along what is known as the Conkey land? A. Yes. * * * Q. And at any time have you been able to vision any difference in accretion areas there in that vicinity? A. There are parts of the land that have been free from water erosion longer than others. In some places you find cottonwood trees that are pretty

old. In other places about all the timber you find is white willow growing up there a short time. * * * Q. Isn't it a fact, Mr. Bacon, that there were large trees and other evidence of vegetation east of the chute that gave indication of having been there for quite a while? A. There were trees, large trees west of the chute, but east of the chute was just yearling willows and there weren't any large trees."

The following constitutes an excerpt from the evidence of Henry Francisco: "Q. Do you know what year it was when the river was the fartherest west? A. The fartherest west? Q. Yes. A. It quit cutting there I think in 1909. Q. And it was in 1909 the river was right on the Conkey land, wasn't it? A. Yes, it was practically where the high bank is now. * * * Q. What way was the river running in 1909 in front of the Conkey land? A. Running south. * * * Q. Henry, when you say the river stopped cutting along the high bank in about 1909 that high bank was located just about where the high bank is located on exhibit 4? A. I didn't say started to cut in 1909. I said quit cutting in 1909. Q. And left the high bank? A. Yes. Q. And the high bank that was left at that time was in the same location as it is today? A. Practically the same as it is today. * * * Q. Are you sure that year was 1909, or was it thereabouts? A. I am pretty positive it was doing its last cutting in there in 1909. Q. That was perhaps in the spring, wasn't it? A. In the spring when the ice went out, in the June rise (1910). Q. When the ice went out in the spring? A. Yes. * * * Q. So then in 1910 the river changed its course and went off east? A. It went over east there. Q. The point at which it changed and started east was up around the north line of section 13, wasn't it? A. Above the north line of 13. Q. North of the north line of 13? A. Yes. * * * Q. When was that, in the year 1910? A. In the spring of 1910. Q. You mean to say in the spring of 1910 there was a great volume of ice against that west bank? A. You see it commenced to run slower—didn't have power enough and kind of blocked up. Q. During that period of ice gorge, the water was over that entire territory? A. Practically all.

Q. When the water went down the current of the Missouri river was way off to the northeast? A. The main current of the Missouri river was way over east, but there was a big bayou around on this south side. * * * Q. What was the general course of the main current of the stream after this ice gorge and the water had subsided and you found the current over to the northeast? A. It was practically straight south. Q. About how far east was it running then of its original, most westerly high bank? A. Must be close to a mile."

A part of the testimony of Will Brewer is as follows: (Brewer made a contract for the land in 1932 and closed the deal in 1934): "Q. You don't know any of the history of the river before you took the land, do you? Did you know where it was? A. No, I do not. Q. And the river hasn't run along the high bank since you got the land? A. No, sir, not that I know of. Q. In fact it wasn't in sight at all at the time you bought the land, was it? A. No, sir."

Birt Smith testified in part, as follows: "Q. That river went right south, didn't it, cutting off several miles? A. Yes, it went back quite a little bit. * * * Q. In 1909 wasn't the river on west of the Brewer land, is that right? A. No, that is not true. * * * Q. Where was the river in 1910? A. She moved back north and east again. * * * Q. It happened when, in 1909 or 1910? A. The spring of 1910. Q. Then the river run along this high bank and down along the Brewer land and on east in 1909, and then until 1910, is that right? A. She run down along there in 1909. Q. And then in 1910 you say it had an ice gorge? A. In the spring of the year; yes, sir. Q. Where was the ice gorge? A. Up near Cisco Point we always called it. Q. How far north of the farm that you farmed was that ice jam? A. About a mile and a half. Q. About a mile and a half north? A. About a mile and a half north; yes, sir. Q. And that ice jam, did it change the main channel of the Missouri river? A. Yes, sir. Q. And it caused the main channel to go off east? A. Yes, sir. Q. In 1910? A. Yes, sir, the spring of 1910. Q. Do you know how far east it went—did it go more

or less in an easterly direction toward the combination bridge? A. It was too muddy to see. Q. You know it did go on east? A. Yes. Q. Did it go north of section 16 when it jumped? A. I ain't positive, but I think it did. * * * Q. Was that the condition in 1909 when it was cutting in there? A. Yes. Q. More or less narrow along the high bank, was it? A. Yes. Q. And cutting fast? A. Yes, sir. Q. And that jammed in 1910, and has it ever been back along the high bank since 1910, Birt? A. No, sir. * * * Q. That was in the spring of 1910 that ice jam formed, was it? A. Yes, sir. * * * Q. At the time in 1910 when the ice gorge came near Cisco Point, as you have designated it, the river at the time was running along the west bank, is that true? That is along the Conkey land and toward the Brewer land as you have described? A. Yes, sir. Q. During that winter the river didn't erode any land in there or cut away any land? A. No. Q. Didn't recede or make any accretion, did it? A. No, sir. Q. When the ice gorge came in early 1910 the river was in the same channel as it was when it froze up in the fall? A. Certainly. Q. Then when the ice gorge came there was water over the entire territory? A. Yes. Q. The whole thing was covered with water? A. Yes, sir. Q. And when the ice gorge went out and the river again pursued its southeasterly course you found the river way off to the northeast? A. Yes, sir. Q. In an entirely different channel, is that true? A. Yes, sir. Q. And that happened in the spring of 1910? A. Yes, sir. * * * Q. Isn't it a fact, Birt, the river about that time, about 12 or 13 years ago, came back into that territory up there along the Brewer land and along this Mondamin section 21, and on east? A. No. Q. Did you say, Mr. Smith, the river has never been back in that vicinity since 1910? A. Yes, sir, I will say that. Q. You say that is a fact? A. Yes, sir. Q. Is your recollection that this high bank which has been described in the evidence as running east and west through the Brewer land was made by the erosion of the river about the year 1909? A. Yes, sir. Q. And then the river on account of an ice gorge left that territory entirely and went over to the

northeast, is that true? A. Yes, sir. Q. And has never been back in that territory since? A. No, sir. Q. Did you say in your direct testimony you lived on the Brewer land at one time, and that you fenced the Brewer land? A. Yes. Q. You of course then know the extent of that Brewer land? A. Yes, sir. * * * Q. Birt, you do know however the river in 1910 jumped from what you call the 'Cisco Point,' is that right? A. Yes, sir. Q. That Cisco Point was north of section 13, is that right? A. Yes, sir. Q. And then it went off to the northeast as far as you could see it? A. Yes. * * * Q. And left the high bank of the land east of the Conkey land and moved off in a jump? A. Yes, sir. * * * Q. Following this ice gorge in the spring of 1910 which you described in your testimony, and then the sudden change of the river, immediately after that change all of this land down northeast to the Conkey land and north of the Brewer land, etc., appeared there against those lands, is that true? A. Yes, sir. Q. So that the river was then to the north and east of this accretion land, that so-called accretion land, is that true? A. Yes, sir. * * * When it left Cisco Point, it started to the northeast. Q. Little to the northeast and then bent south? A. Yes, south and east, yes."

Hans Knudsen, testifying as to the condition of sections 16 and 17 of the so-called "accretion area" when he took possession thereof in 1933 and 1934, states: "Q. What was the character of the rest of the land that wasn't plowed? A. There was some good-sized cottonwood trees where they hadn't cut them up, but some fellows cut them off. They did that right there and cut them off in other places. There was willows. * * * Q. You say cottonwood trees—what is the size of these trees? How would they run? A. The biggest ones already cut, but some must be 2 feet in diameter, I think. * * * Q. And do you remember about the year that the river left that high bank, if it did? A. It left in 1910. Q. Do you remember the circumstances under which it left? A. Yes, I do. Q. Will you tell them to the court? A. I was in Jackson and the river was there, and there was a couple of fellows that was farming close to town, and we talked

about driving out. We drove out and picked up Joe Brennan north of Jackson a half a mile. Joe Brennan got in the wagon and we drove out to see the river probably a day or two after the river broke through to the east. Just what date it was I couldn't say, but it was 1910. Q. Did you observe anything else in the old river channel? A. The old river channel was full of ice. Q. There was what we call an ice jam in the old channel? A. Yes, sir. Q. About where did the river break away from the old channel and proceed east? A. Practically up there a little better than a quarter of a mile north of Wood's house. I think probably 10 or 15 rods farther north of his fence. Q. North of the north line of section 13 would it be? A. A little bit on the north line of 16, and of course that would be north of 13 too. * * * Q. And what is the general direction of the combination bridge from the point that it broke away? A. That combination is due east of the south line of 16. That would be a mile north of the combination bridge where it broke away. I would say about 8 miles straight east, perhaps a little better. That is about what it was. Q. So far as you could see it was proceeding almost east, was it, toward the combination bridge? A. Yes, it seemed that the ice gorge had thrown it out a little at that time, but after it got past the gorge it was going straight east. Q. And was that north of section 16 then or not? A. That would be 12 or 15 rods north of section 16 where that point is. Q. Did the river ever come back to this old high bank channel we have talked about in here? * * * Since 1910, I mean? A. No, sir. * * * Q. And when the river broke away from the point you have described in 1910 and proceeded east, did it leave this bar land remaining you have just talked of and described? A. Yes, sir. Q. And has it been there ever since, or do you know? A. The 'bar' has been there. * * * Q. What was the character of the river when it run along the high bank? Was it wide or narrow? A. Narrow, awfully narrow, and the high bank awfully high. Q. Still high, isn't it? A. Yes. * * * Q. The river was very deep and narrow? A. It must be deep, because it was narrow. * * * Q. The river was all

to the west of section 16 at that time? A. Yes, sir. Q. Was it to the west of section 17 also? A. Yes, sir. * * * Q. During the normal stages of the river was that land on sections 16 and 17 in about the year 1908 and 1909 dry or wet? A. It was dry. * * * Q. When this ice gorge gave way all this land was flooded, wasn't it? A. Last spring? Q. No, in 1910? A. No. Q. All this land wasn't flooded? A. No, sir. * * * Q. You have stated in your testimony you have been out all over this tract of accretion of bar land, or whatever it may be, and that you have examined the vegetation and growth on all of the 'bar' have you, isn't that true? A. I have been over that 'bar' a good many times; yes, sir. Q. You talked about there being some large trees? A. There is right now. Q. Where are they located, Mr. Knudsen? A. There are 4 pretty good-sized cottonwoods standing on the north half of the southwest quarter. Q. North half of the southwest quarter of section 16? A. Yes, sir. Q. Now where are there any other large trees on this tract? A. They are probably about the only 4 left standing. They were cutting them down and I told them they better leave those 4; the house was standing pretty close to them, and leave them for shade trees. * * * Q. At the time you observed the change of the river in the spring of 1910 was there the growth on this land which you are now occupying of cottonwood trees? A. Yes, there was cottonwood trees there. At that time I would say the willows were some of them 12 or 14 feet high, but there was cottonwood trees between them. Q. Were any willows at the time of the ice gorge and the change standing up above the water or ice in the river? A. There was some above them, above the water and the ice. Q. Could they be seen from where you were viewing the situation? A. Yes, sir. * * * Q. When this river made this change in the spring of 1910 along the new course which you have outlined in your testimony, was that down a former, abandoned channel of the river—the Missouri river—or was it entirely new territory? A. It was new territory it went across. * * * Q. Since 1910 it has never cut back into section 16 whatever? A. No, sir. Q.

Stayed at least a half a mile to the east of that section? A. Yes, sir. Of course when the water gets high there will be water running down this chute there, but as quick as the water going—goes down the river—(Interrupted) Q. From the spring of the years 1907, 1908 and 1910 to at least 1930 when the river would get high there would be water running along the high bank in front of Conkey's and Heffernan's, and along the Brewer land, isn't that a fact? A. Yes, when the river was high. Q. You have seen a lot of water north of the Brewer land in recent years, haven't you, between the high bank and the Brewer land in section 16? A. It backed up from the east. I haven't seen any running through there for 7 or 8 years probably. * * * Q. Mr. Knudsen, you were just asked if this land north of 21 had existed after 1910. Had it existed also before 1910? A. Yes, sir. Q. And was its character similar to its character as it is today? A. Yes, sir. Q. Before 1910? A. Yes."

Sophus Autzen testified in part as follows: "Q. And what, if any, action did the river take in 1910, if you know? A. Well, it changed off on the north side, and went down along on the north side of section 16, running north and east. Q. After 1910 did it continue running along the line between 'A' and 'B' or did it go east? A. It went east. Q. Did it leave its old channel as established between 'A' and 'B'? A. Yes. Q. And about where, if you know, did the river break away in 1910 and proceed east, break away from the old channel? A. Up along the north side of section 13. Q. North of the north line of section 13? A. Along the south line—along the north side of 13. Q. Do you know what, if anything, caused the change in the river at that time? A. An ice gorge. Q. Do you know whether the river since 1910 has ever come back to its old channel as exhibited between 'A' and 'B' on exhibit 'K'? A. No, never been back there since. * * * Q. When the river broke away from the point north of the north line of 13 and 16 what was the character of the land in section 17 and 16 at that time? A. It was willows and cottonwoods. Q. As compared with the way it exists today, was it different or about the same as it

exists today? A. Just about the same as it is now. * * * Q. Tell the court where this river bank ran east and west through section 21 in reference to the farm buildings. A. It run out from north on 13 and then east around 16 and hit over to where the ranch buildings are now."

The facts thus clearly established in the instant case invoke the application of the principles announced by the supreme court of the United States in *Nebraska v. Iowa,* 143 U. S. 359, 12 S. Ct. 396. The opinion of that court by Mr. Justice Brewer includes the following:

"It appears, however, from the testimony, that in 1877 the river above Omaha, which had pursued a course in the nature of an ox-bow, suddenly cut through the neck of the bow and made for itself a new channel. This does not come within the law of accretion, but of that of avulsion. By this selection of a new channel the boundary was not changed, and it remained as it was prior to the avulsion, the center line of the old channel; and that, unless the waters of the river returned to their former bed, became a fixed and unvarying boundary, no matter what might be the changes of the river in its new channel."

And, further: "It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion. In Gould on Waters, section 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.' 2 Bl. Comm. 262; Angell on Water Courses, sec. 60; *Trustees of Hopkins Academy v. Dickinson,* 9 Cush. 544; *Buttenuth v. St. Louis Bridge Co.,* 123 Ill. 535; *Hagan v. Campbell,* 8 Porter (Ala.) 9; *Murry v. Sermon,* 1 Hawks (N. Car.) 56.

"These propositions, which are universally recognized as

correct where the boundaries of private property touch on streams, are in like manner recognized where the boundaries between states or nations are, by prescription or treaty, found in running water. Accretion, no matter to which side it adds ground, leaves the boundary still the center of the channel. Avulsion has no effect on boundary, but leaves it in the center of the old channel."

In *Missouri v. Nebraska*, 196 U. S. 23, 25 S. Ct. 155, we have a case where it appears that prior to July 5, 1867, the bed and channel of the Missouri river were substantially the same as they had been continuously from the date of the admission of Nebraska into the Union. On that date and within a period of 24 hours, during a time of very high water, the Missouri river, which had for years passed around what is called McKissick's island, cut a new channel across and through a very narrow neck of land at the west end of Island precinct (of which McKissick's island formed a part), about a half mile wide, making for itself a new channel and passing through what was admittedly, at that time, territory of Nebraska. After that time the river ceased to run around McKissick's island. In the course of a few years, after a new channel was thus made, the old channel dried up and became tillable land, valuable for agricultural purposes, whereby the old bed of the river was vacated some 15 miles in length. The change in the bed or channel had become fixed and permanent; for, at the commencement of this suit it was the same as it was immediately after the change that occurred on July 5, 1867. On this state of facts the supreme court of the United States announced the rules:

"Accretion is the gradual accumulation by alluvial formation and where a boundary river changes its course gradually the parties on either side hold by the same boundary—the center of the channel. Avulsion is the sudden and rapid change in the course and channel of a boundary river. It does not work any change in the boundary, which remains as it was in the center of the old channel although no water may be flowing therein. These principles apply

alike whether the rivers be boundaries between private property or between states and nations.

"The boundary line between Missouri and Nebraska in the vicinity of Island precinct is the center line of the original channel of the Missouri river as it was before the avulsion of 1867 and not the center line of the channel since that time, although no water is now flowing through the original channel."

In *Kinkead v. Turgeon*, 74 Neb. 580, 109 N. W. 744, it appears that the case was submitted to this court upon a stipulation that in and since 1876 the plaintiff was the owner of riparian lands on the Missouri river, a navigable stream; that by a sudden change of the channel the waters receded from plaintiff's land and left an abandoned river bottom between the former high water mark of the river and the middle of its former channel which is now occupied by the defendants. The plaintiff prevailed in this court. In the opinion by Letton, J., the cases of *Nebraska v. Iowa*, 143 U. S. 359, 12 S. Ct. 396, and *Missouri v. Nebraska*, 196 U. S. 23, 25 S. Ct. 155, are cited with approval, and the controlling principle announced: "Where the Missouri river suddenly changes its course and abandons its former bed, the respective riparian owners are entitled to the possession and ownership of the soil formerly under its waters as far as the thread of the stream, and may maintain ejectment to oust squatters within such limits." See, also, *Stockley v. Cissna*, 119 Fed. 812.

And, again, in the still later Nebraska case of *Iowa Railroad Land Co. v. Coulthard*, 96 Neb. 607, 148 N. W. 328, the rule was reiterated in the following terms:

"Where a stream which is a boundary from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; the boundary remains as it was in the center of the old channel, although no water may be flowing therein. *State of Nebraska v. State of Iowa*, 143 U. S. 359.

"If the change in the stream is violent and visible, and arises from a known cause, such as a freshet, or a cut

through which a new channel has formed, the original thread of the stream continues to mark the limits of the two estates. Gould, Waters (3d ed.) sec. 159."

It is obvious that this so-called "accretion area" was not the result of the accumulation of alluvium occasioning a gradual and imperceptible change of the channel of the Missouri river. The cause of the change of this river channel was definite and certain, and due to an ice gorge created by a spring flood. The change thus effected thereby was not gradual and imperceptible, but definite, sudden and certain as to time and extent. This so-called "accretion area" had a definite and continued existence prior to the change of the channel in 1910 and its continuance thereafter was not affected thereby, nor were the legal rights thereto in any manner or to any degree terminated or impaired by its submergence from time to time occasioned by flood waters escaping from the ordinary channel of the Missouri river and passing over and across it, covering it in whole or in part and depositing on its surface silt, sand or other débris. *Widdicombe v. Rosemiller*, 118 Fed. 295.

It follows, therefore, that the designation of the lands in suit as a so-called "accretion area" is a misnomer; that the riparian rights of the owners of lands of which the Missouri river formed a boundary in 1909 and the early days of 1910 do not extend by virtue of riparian ownership beyond the thread of its channel as it then existed; that the rights to accretion beyond such boundary do not exist; and that the rights of adverse possession claimed or possessed by the parties to this litigation must be determined without reference to their claimed riparian rights or the fact that the premises to which such claims are made are alleged to be "accretion lands."

Thus, the decrees entered by the district court on the 6th and 7th days of January, 1941, are in all respects erroneous. These judgments are, therefore, reversed, and the cause is remanded for further proceedings in harmony with this opinion.

REVERSED.