**UNITED STATES**

v.

**Roy Tibbals WILSON et al.**

**OMAHA INDIAN TRIBE, etc.**

v.

**Harold JACKSON, et al.**

**OMAHA INDIAN TRIBE, etc.**

v.

**AGRICULTURAL INDUSTRIAL INVESTMENT COMPANY et al.**

Nos. C 75–4024, C 75–4026 and C 75–4067.

United States District Court, N. D. Iowa, W. D.

May 4, 1977.

See also, 433 F.Supp. 67.

William H. Veeder, Washington, D. C., Donald E. O'Brien, Sioux City, Iowa, James J. Clear, Dept. of Justice, Washington, D. C., for plaintiffs.

Thomas R. Burke and Lyman L. Larsen, Omaha, Neb., Peter J. Peters, Council Bluffs, Iowa, Lowell C. Kindig and Maurice B. Nieland, Sioux City, Iowa, Edson Smith, Omaha, Neb., Jack W. Peters, Council Bluffs, Iowa, Bennett Cullison, Jr., Harlan, Iowa, for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

This is a memorandum opinion prepared and filed by the Court for the purpose of setting out this Court's resolution of the choice of law problems presented by these consolidated Blackbird Bend-Barrett Survey Area cases. As will be discussed below, the choice of law problems are of primary importance in dealing with the allocation of the burden of persuasion in these cases, but would not be determinative of the general definitions of the terms accretion and avulsion.

### I.

Generally, questions of title to land situated within a state are governed by that state's law, regardless of whether such questions are being litigated in state or federal courts. *Mason v. United States*, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923). This general proposition extends not only to questions of legal title *per se*, but also to questions concerning the rights of riparian landowners to accretion lands. *Joy v. City of St. Louis*, 201 U.S. 332, 26 S.Ct. 478, 50 L.Ed. 776 (1906). The rule established by the case law has been incorporated into a codification known as the Rules of Decision Act, 28 U.S.C. § 1652, which provides:

> The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded

as rules of decision in civil actions in the courts of the United States, in cases where they apply.

The above-quoted statute does apply to disputes over title to land. *Mason v. United States*, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923). Thus, unless federal law provides otherwise, state law would provide the rule of decision for this case. It should be noted at this point that, in the event state law does in fact supply the rule of decision, Fed.R. Evid. 302 would apply as well. Fed.R. Evid. 302 provides:

> In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with state law.

*See also Cities Service Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939).[1]

Before any discussion of the issue whether a provision in the Constitution, treaties or congressional enactments compels an exception to the rule that state law controls disputes over title to real property, the problem of which state law would apply should be dealt with. The land involved in this litigation was on the Nebraska side of the river as of 1867. The thalweg of the Missouri River was the Nebraska-Iowa boundary prior to 1943. *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892). Prior to the 1943 Nebraska-Iowa Boundary Compact, the movements of the river would be directly relevant (indeed, any accretion river movements would be controlling) on the location of the Nebraska-Iowa boundary. *Id.* With the 1943 Nebraska-Iowa Boundary Compact, one point became firmly established: regardless of who owns the Blackbird Bend area within the 1867 Barrett Survey Meander line, that area is on the Iowa side of the boundary.

The difficulty here of course lies in the fact that significant changes in the location of the river occurred prior to 1943. The general choice of law problems created by this situation came to a halt in the case of *Nebraska v. Iowa*, 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733 (1972). In that case the Supreme Court began by adopting the Special Master's finding

> . . . that by 1943 the shifts of the river channel had been so numerous and intricate, both in its natural state and as a result of the work of the Corps of Engineers, that it would be practically impossible to locate the original boundary line. 406 U.S. at 119, 92 S.Ct. at 1381.

The 1972 Nebraska-Iowa case began when Iowa claimed thirty separate parcels which were wholly on the Iowa side of the 1943 compact line. For purposes of resolving the choice of law issues, the Court divided the thirty parcels into two groups. The classification was based on whether the land in the parcels was formed before or after 1943. With respect to the parcels which were found by the Special Master to have been formed after 1943, the Court held that Iowa law would govern title disputes, except that claimants to those areas would have the opportunity to show good title under Nebraska law as of the 1943 Compact date. Significantly, the Court found that Blackbird Bend was one of the areas formed after 1943. 406 U.S. 117 at 120 n. 4, 92 S.Ct. 1379 at 1382, 31 L.Ed.2d 733 at 737 (1972).[2]

Thus, under the 1972 *Nebraska v. Iowa* decision, Nebraska law would provide the rule of decision for land disputes as to river changes occurring prior to 1943, and Iowa law would provide the rule of decision for changes occurring after that date. These guidelines would clearly apply if all of the parties to this lawsuit were private, nongovernmental entities. Thus the issue to be

---

1. While the defendants here are urging the use of Iowa law in order to avail themselves of Iowa's presumption in favor of accretion, it is at least arguable that federal law may recognize a similar presumption. *See Mississippi v. Arkansas*, 415 U.S. 289, 94 S.Ct. 1046, 39 L.Ed.2d 333, 342 (1974). *cf.* 78 Am.Jur.2d 874, Waters § 427 (1975).

2. Of course, this finding is not *res judicata* as to the factual issues raised in the instant case, but serves only to help arrive at a practical resolution of the choice of law problems.

resolved is whether the fact that the United States as trustee and the Omaha Indian Tribe as beneficiary are claimants to the land involved in this lawsuit creates an exception to the general rule that state law controls in land litigation.

Contrary to the government's assertion, the fact that the United States, as trustee for the Tribe, claims the land involved in this lawsuit does not make federal law controlling. *See Mason v. United States*, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396 (1923); *see also United States v. Little Lake Misere Land Company, Inc.*, 412 U.S. 580, 595, 93 S.Ct. 2389, 2398, 37 L.Ed.2d 187 (1973); *Wright*, 14 *Federal Practice and Procedure*, 141 N. 4 (1976). The case of *Hughes v. State of Washington*, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967), might arguably support an argument that the presence of the United States as a claimant converts the case to one governed by federal law. However, it appears that *Hughes* is limited to its somewhat unique factual situation, which involved oceanfront property and thus was closely involved with the nation's international boundaries. *Oregon ex rel. State Land Board v. Corvallis Sand and Gravel Company*, 429 U.S. 363, 377, 97 S.Ct. 582, 590 n. 6, 50 L.Ed.2d 550 (1977).[3]

Further, the majority of cases which have decided the question have turned to state law to resolve questions of land ownership when Indian tribes are involved as claimants. In the case of *Fontenelle v. Omaha Tribe of Nebraska*, 298 F.Supp. 855 (D.Neb. 1969), *aff'd*, 430 F.2d 143 (8th Cir. 1970), Nebraska law was applied in an accretion-avulsion dispute between the Omaha Indian Tribe and private claimants who were descendants of, and traced their title back to, Logan Fontenelle, who had been a chief of the Omahas. *See also Herron v. Choctaw and Chickasaw Nations*, 228 F.2d 830 (10th Cir. 1956), which applied Oklahoma law in a title dispute between an Indian tribe and private claimants. Finally, the case of

*Francis v. Francis*, 203 U.S. 233, 27 S.Ct. 129, 51 L.Ed. 165 (1906), upheld the determination of the Michigan Supreme Court that an Indian treaty reserved certain lands to individual Indians in fee simple, thus giving the individual Indians and their heirs the right to convey the land without restriction and making title in the land subject to an adverse possession claim. In *Francis*, the Supreme Court stated:

. . . the construction of the treaty here involved, whereby the respective Indians named in its 3d article are held to have acquired by the treaty a title in fee to the land reserved to the use of themselves, has become a rule of property in the state where the land is situated. That rule of property should not be disturbed, unless it clearly involves a misinterpretation of the words of the treaty of 1819.

In short, the fact that the United States and the Omaha Indian Tribe are claimants to the Blackbird Bend area within the 1867 Barrett Survey Meander line does not, standing alone, alter the general rule that the law of real property ownership is found in the law of the state in which the property in question is situated.

Under the Rules of Decision Act, 28 U.S.C. § 1652, the Constitution, treaties and Acts of Congress must be examined in each case to determine whether federal law supplants state law as the rule of decision.

The Constitution contains nothing which would compel an exception to the general rule. While it may be that the commerce clause, Article I, § 8, Cl. 3, would empower Congress to mandate the use of federal law in cases such as this, Congress has not done so. It seems clear that neither the terms of the commerce clause nor reasonable inferences to be drawn from those terms compel abandonment of state law in this case.

An examination of the three treaties received into evidence which relate to the Omaha Tribe (Treaty with the Sauk and Foxes, et al., 1830; Treaty with the Oto, et

---

**3.** In any event, *Hughes* was concerned only with the question whether a title included accretion lands deposited subsequent to issuance of a patent, not whether accretion had in fact occurred.

al., 1836; Treaty with the Omaha, 1854), together with the "Documents of Selection" (under which the Omaha Tribe selected their reservation lands) discloses that nothing in these treaties and documents precludes the application of state law. The only express limitations which the treaties place upon disposition of the lands are the restraints against alienation familiar to Indian law. To the extent that they supplant state law, such restraints do create an exception to the general rule that state law controls the tenure, transfer, control and disposition of real property. *Sunderland v. United States*, 266 U.S. 226, 45 S.Ct. 64, 69 L.Ed. 259 (1924).

Research has disclosed no Act of Congress which displaces state law with federal law in cases such as this. While there need not be an express repudiation of state law, there must be some indication of a need for the use of federal law, such as a case where federal land acquisition has been part of an extensive federal regulatory program. *United States v. Little Lake Misere Land Company, Inc.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973). This Court is unable to discern any federal policy broad or strong enough to supplant the strong local policy concerning title to land. This case should be governed by state law. Virtually all of the analogous cases have used state law. In short, this case should be governed by the choice of law principles laid down in *Nebraska v. Iowa*, 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733 (1972).

## II.

■ Nebraska law recognizes and adheres to the principles developed at common law for the resolution of title and boundary disputes which arise when the contour of riparian land has been changed by a river's movements. Simply stated, when a river which forms a boundary between two parcels of land moves by processes of erosion and accretion, the boundary follows the movements of the river. *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647 (1935). On the other hand, when a river which forms a boundary between

two parcels of land abruptly moves from its old channel to a new channel through an event known as avulsion, the boundary remains defined by the old river channel. *Iowa Railroad Land Co. v. Coulthard*, 96 Neb. 607, 148 N.W. 328 (1914). The jurisdiction of Nebraska applies these principles to the movements of the Missouri River. *De Long v. Olsen*, 63 Neb. 327, 88 N.W. 512 (1901).

■ Nebraska law generally defines the process of accretion as the slow, gradual and imperceptible addition by a body of water of solid material, made up of silt and sediment, against and to a shore line. *See Mercurio v. Duncan*, 131 Neb. 767, 269 N.W. 901 (1936). Accretions become attached to and extend an existing riparian shore line. *Jones v. Schmidt*, 170 Neb. 351, 102 N.W.2d 640 (1930). Nebraska law also applies the law of accretion (*i. e.* that accretion land becomes the property of the riparian landowner of the land to which it attaches) to land uncovered by a process known as reliction. *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647 (1935). Reliction is defined as the process by which a gradual recession of water from a shore line uncovers land. *Id.*

■ One of the indicia of accretion is that the water's deposit of the silt and sediment along the shore line has been gradual and imperceptible. *Mercurio v. Duncan*, 131 Neb. 767, 269 N.W. 901 (1936). Nebraska law has objectively defined the terms gradual and imperceptible to mean that, while an observer of riparian land could see from time to time that erosion had taken place and that deposits had been made, the process of erosion and deposition could not be observed while it was actually taking place. *Gill v. Lydick*, 40 Neb. 508, 59 N.W. 104 (1894). The fact that a gradual and imperceptible deposit of alluvion is one indication of accretion does not, however, mean that Nebraska law recognizes the length of time involved in a river movement as a strong element of an accretion case. This point is particularly important in the resolution of a dispute over whether a change in the location of the Missouri

River has been by accretion or by avulsion. In the case of *De Long v. Olsen*, 63 Neb. 327, 88 N.W. 512 (1901), the Nebraska Supreme Court rejected a contention that the law of accretion should not apply to the Missouri. The contention rejected in *De Long* was based upon the generally acknowledged phenomenon that even erosive changes in the channel and banks of the Missouri River are too rapid and too perceptible to allow the land formed thereby to be termed accretion. *See Nebraska v. Iowa,* 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892). In the case of *Kinkead v. Turgeon,* 74 Neb. 573, 109 N.W. 744 (1906), *vacating,* 74 Neb. 573, 104 N.W. 1061 (1905), the Nebraska Supreme Court discussed the vagaries of the Missouri River, and the following language of the *Kinkead* Court demonstrates that the amount of time involved in a river's change does not control the decision of whether the change was accretive or avulsive:

It is a matter of public knowledge of which the court will take judicial notice that that great river in this locality takes its course through a wide valley composed in the main of loose, sandy, and friable soil of great fertility; that it is subject to annual floods, sometimes of great extent and volume; that its course is erratic and tortuous; that sometimes during flood periods, its current will strike or impinge upon its banks at such an angle and with such effect, as, even in a single day, to undermine the same and cause large masses of soil to fall into the stream and be disintegrated and thus whole farms are swallowed up with almost inconceivable rapidity, while in other localities hundreds of acres are often added to its banks by the process of accretion. It is further a matter of common knowledge that at a number of points along the northern and western boundary of the state the river has, as in this case, cut across the neck of a peninsula, entirely abandoned its old bed and left the former peninsula with the abandoned bed entirely across the river upon the eastern or northern bank and thus physically dissevered from the state of Nebraska and con-

joined to Dakota, Iowa or Missouri. (Citations omitted.) 109 N.W. at 746.

Thus it may be said that, under Nebraska law pertaining to the Missouri River, the fact that a change in the channel and bank of the Missouri River has not taken place gradually in terms of an extended period of time does not dictate a finding that the change has not been wrought by an accretion. A case in point is *Conkey v. Knudsen,* 143 Neb. 5, 8 N.W.2d 538 (1943), *vacating,* 141 Neb. 517, 4 N.W.2d 290 (1942). *Conkey* involved a dispute among riparian claimants over land created when the Missouri River had, in the area in question, moved its channel over a mile north and east of its former location during a single high water period caused by a large ice jam. The trial court had determined that an accretion had taken place. In the first appeal the Nebraska Supreme Court concluded that the determination of accretion was error, noting that the change:

. . . was not gradual and imperceptible, but definite, sudden and certain as to time and extent. 4 N.W.2d at 301.

In the first appeal the Court was so certain of its conclusion that an accretion had not taken place that it termed this conclusion as supported beyond a reasonable doubt by the evidence. 4 N.W.2d at 295. Upon rehearing, the Nebraska Supreme Court reversed itself and vacated its former opinion. 8 N.W.2d 538 (1943). In its reexamination of the case, the Court considered evidence that the vegetation in the area in question had grown there only since the change had taken place. The Court noted that the evidence tended to support a finding of either an accretion or a reliction, since

The record does not disclose from what land, if any, the area was cut off by avulsion, or the situation existing from which it might be reasonably inferred that it could be identified as the same land that had washed away from some other surveyed tract or plot marked out on the ground. 8 N.W.2d at 541.

The Court further stated that the fact that the river had sought an entirely new channel as the waters receded from the flood did

not rebut the conclusion that an accretion had occurred. Finally, the Court noted that, in cases involving the Missouri River, the transition of former river bed to arable land often takes place more rapidly after an accretion than after an avulsion, because avulsions often leave lakes which may exist for many years in the former channel bed.

■ One common thread running through the Nebraska cases involving accretions is the requirement that the river have moved its channel and banks through a process of erosion on one bank and deposition of silt and sediment on the opposite bank. *See Wiltse v. Bolton*, 132 Neb. 354, 272 N.W. 197 (1937). In other words, the definition of accretion requires that a river, in the process of moving its channel location from one place to another, erode the land between its present and former channels and replace the eroded land with alluvion. In fact, where a river has changed its channel slowly without eroding the land in between, Nebraska does not apply the law of accretion. *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946). *Ecklund* held that

. . . where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream. (Quoting *Commissioners of Land Office of Oklahoma v. United States*, 270 F. 110, 113 (8th Cir. 1920) 23 N.W.2d at 789–790.

Thus, it seems that, while the consistently intoned Nebraska definition of accretion includes the terms "gradual and imperceptible," the process of excavation, or erosion and replacement by silt and sediment from upstream, is actually the linchpin of the application of the law of accretion. The process of accretion may be either rapid or gradual, at least in cases involving the Missouri River.

■ Nebraska law generally defines avulsion as a sudden departure by a river from its former channel and location in either a newly formed channel or pre-existing slough or high water channel. *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647 (1935); *Iowa Railroad Land Co. v. Coulthard*, 96 Neb. 607, 148 N.W. 328 (1914). While the key indication of an accretion is erosion, the key indication of an avulsion is that the land which is displaced in relation to the river, or remains while the river displaces itself, can be identified as the same piece of land as existed before the change. *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647 (1935); *Iowa Railroad Land Co. v. Coulthard*, 96 Neb. 607, 148 N.W. 328 (1914). For example, upon rehearing in *Conkey v. Knudsen*, 143 Neb. 5, 8 N.W.2d 538 (1943), *vacating*, 141 Neb. 517, 4 N.W.2d 290 (1942), the Court noted that one of the factors demonstrating that an accretion and not an avulsion had taken place was the absence of evidence showing that the land in question was identifiable as having remained intact through the substantial change in the channel of the river.

■ While the factor of time is not controlling in a finding of accretion, Nebraska law recognizes that avulsions are characteristically sudden and rapid in terms of time. *Frank v. Smith*, 138 Neb. 382, 293 N.W. 329 (1940). *Compare State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946).

The Nebraska definition of avulsion often refers to an abandonment of a river's old channel. *e. g. Frank v. Smith*, 138 Neb. 382, 293 N.W. 329 (1940). The use of the

term "abandon" implies that, in cases of avulsion, the old channel remains relatively intact and often continues to hold water for several years following the avulsive event. *See Conkey v. Knudsen*, 143 Neb. 5, 8 N.W.2d 538 (1943), *vacating*, 141 Neb. 517, 4 N.W.2d 290 (1942). This implication finds further basis in the fact discussed above that accretion is characterized by erosion. In other words, while an accretion would likely destroy the riverbank on the side of the direction to which the river moves, an avulsion is more likely to leave both sides of its banks relatively intact. Of course, where a bank is composed of point bar deposits, or sand and sediment, it may be more difficult to determine whether a bank and adjacent riparian land has remained intact through a change of a river channel. This Court does not mean to imply that movement by accretion, particularly one which occurs rapidly, will not leave behind sloughs or marshes which can be identified as remnants of the former channel. Because river movements, and accompanying scour, erosion and deposition, are not uniform, accretion deposits are not uniform. Therefore the river may not entirely fill in its former channel. *See Rupp v. Kirk*, 231 Iowa 1387, 4 N.W.2d 264 (1942).

It may be noted that Nebraska law places the burden of persuasion upon one who seeks to quiet title, and that burden requires that the strength of the title of the one seeking to quiet title be shown, rather than weakness in the titles of adverse claimants. *Mitchell v. Beermann*, 175 Neb. 616, 122 N.W.2d 525 (1963); *Bissel v. Fletcher*, 27 Neb. 582, 43 N.W. 350 (1889). The burden is so allocated even though a quiet title action is based on a claim of accretion as against adverse claims of avulsion. *Jones v. Schmidt*, 170 Neb. 351, 102 N.W.2d 640 (1960). Iowa law, on the other hand, recognizes a strong presumption favoring accretion as opposed to avulsion. *Kitteridge v. Ritter*, 172 Iowa 55, 151 N.W. 1097 (1915).

Another significant difference between Nebraska and Iowa law which is relevant to this case is that under Iowa law the State of Iowa claims the beds of, and islands within, all navigable rivers within the state. *Holman v. Hodges*, 112 Iowa 714, 84 N.W. 950 (1901). *See also Nebraska v. Iowa*, 406 U.S. 117, 92 S.Ct. 1379, 1382, 31 L.Ed.2d 733 (1972). Nebraska law, on the other hand, gives a riparian owner title to the center of the main channel. *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647 (1935). Counsel for Plaintiffs herein make much of this distinction, arguing that Defendants cannot prove title by accretion unless they can demonstrate that the claimed accretion lands were attached to the riparian bank at a point above the ordinary high water mark. *See Dartmouth College v. Rose*, 257 Iowa 533, 133 N.W.2d 687 (1965). However, assuming a failure of Defendants' proof on this point, that failure alone would not assist the Plaintiffs in their quiet title action, since they must demonstrate the strength of their title to prevail, and cannot rely on an alleged weakness in Defendants' title. *See 65 Am.Jur.2d* 207–208, Quieting Title § 78 (1972).[4] Such a failure of proof could at most adversely affect the Defendants' counterclaims to quiet title, upon which Defendants bear the burden of persuasion.

Apart from the differences just discussed, this Court wishes to note that it has researched both federal and Iowa laws of accretion and avulsion, and found that, as to definitions of those terms with respect to the Missouri River, there are no significant differences among federal, Iowa and Nebraska laws which are relevant to this case. *See Kitteridge v. Ritter*, 172 Iowa 55, 151 N.W. 1097 (1915); *Wilcox v. Pinney*, 250 Iowa 1378, 98 N.W.2d 720 (1959); *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892). Indeed, Nebraska law has relied heavily on federal law in formulating its definitions of accretion and avulsion.

4. Thus, it has been stated that a Plaintiff has no interest in land if he himself does not own it, and that whomever the court determines to be the true owner is of no concern to him. Having failed to establish title in himself, he cannot complain of an insufficiency of the evidence upon which the court adjudged title to be in the defendant. (Footnotes omitted) *Id.* at 208.

*See, e. g. Kinkead v. Turgeon,* 74 Neb. 573, 109 N.W. 744 (1906), *vacating,* 74 Neb. 573, 104 N.W. 1061 (1905); *De Long v. Olsen,* 63 Neb. 327, 88 N.W. 512 (1901); *Gill v. Lydick,* 40 Neb. 508, 59 N.W. 104 (1894).

### III.

The remaining question to be discussed in this memorandum concerns the allocation of the burden of persuasion. As noted above, generally a claimant, whether a Plaintiff or a counterclaiming Defendant, has the burden of persuasion in a quiet title action as to the strength of his or her own title. At times such a claimant may be aided in overcoming this burden by certain applicable presumptions.

█ In this case the Defendants urge that Iowa law applies and that consequently their evidence is buttressed by Iowa's presumption in favor of accretion. *See Kitteridge v. Ritter,* 172 Iowa 55, 151 N.W. 1097 (1915). Because, under the case of *Nebraska v. Iowa,* 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733 (1972), Plaintiffs are entitled to rely on Nebraska law (which does not recognize presumptive accretion) in proving their title, this Court rejects Defendants' arguments on this point and declines to encumber Plaintiffs with the task of rebutting a presumption in favor of accretion.

█ Plaintiffs likewise contend that their case is assisted by reason of a reallocation of the burden of persuasion. The basis for their argument on this point is 25 U.S.C. § 194, which reads:

In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

The above-quoted provision is, by its terms, triggered when an Indian person in a title dispute has offered evidence to show previous possession or ownership of the land in question. In this case, Plaintiffs could make out such a *prima facie* case by establishing that the land now within the Barrett Survey Line of the Blackbird Bend Area is land (or accretions to such land-in-place) left undisturbed and in place through and following an avulsive change of the river channel. If Plaintiffs establish this fact, however, they have not only triggered the application of 25 U.S.C. § 194 but also have proved their entire case and established their right to relief in the form of a decree quieting title. On the other hand, if the land now within the Barrett Survey Line is land which has accreted to the Iowa shore as Defendants claim, then the land which the Tribe possessed and owned at the time the Omaha Reservation was established has been washed away and replaced. If the evidence supports a finding that the land in question is accretion land to the Iowa shore, then Defendants have proved their case as well as overcome any burden which 25 U.S.C. § 194 might place upon them. In that event, the land now within the Barrett Survey Line simply would not be the land which the Tribe once possessed and owned, although it would occupy the same location. In short, the question whether 25 U.S.C. § 194 applies in this case is inextricably entwined with the merits.

In this connection, it should be noted that Defendants, or their predecessors in title, remained in continuous undisturbed possession of the land in question for over forty years. The Tribe, on the other hand, acquired peaceful possession only with the entry of a preliminary injunction order June 5, 1975. Prior to 1975 various officials and members of the Tribe had on several occasions attempted to enter and occupy the land in the hope of using the Tribe's sovereign immunity from suit to bar ejectment actions and thus obtain possession of the land. In light of these facts this Court is unwilling to find that the Tribe has had possession of the land of a sufficient nature and degree to trigger the shift in the burden of persuasion apparently contemplated by 25 U.S.C. § 194.

In summary, this Court concludes that 25 U.S.C. § 194 is not applicable to this case.

Even if it were, the proof necessary to trigger it would be the same proof which, by itself, would establish the Tribe's title to the land. Neither the parties nor this Court have been able to locate any directly relevant case authority which construes 25 U.S.C. § 194 in a situation like this. *cf. United States v. Sands*, 94 F.2d 156 (10th Cir. 1938); *Felix v. Patrick*, 36 F. 457 (8th Cir. 1888), *aff'd*, 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892). Thus, this case appears to be one of first impression. It seems to this Court that an application of 25 U.S.C. § 194 to an accretion-avulsion case such as this would be unreasonable and circuitous in view of the manner in which that application would mesh with the merits.

■ The practical result of this Court's refusal to apply either the Iowa presumption of accretion or 25 U.S.C. § 194 is as follows: 1) in order to obtain a decree quieting title in them, Plaintiffs have the burden of persuasion as to facts which establish their title; 2) similarly, Defendants bear the burden of persuasion on their counterclaim to quiet title; and 3) failure of either of the two groups of claimants to sustain its burden of proof does not, standing alone, entitle the other side to relief. This Court wishes to state, however, that, after thorough and careful review of the evidence, it is satisfied that its findings of fact are supported by a preponderance of the evidence and would not be altered by any different allocation of the burden of persuasion.

This Court has filed, in separate documents, its findings of fact and conclusions of law, and decree. This memorandum opinion has been prepared and filed for the purpose of expressing the legal· analysis used by the Court in arriving at the rules of law applied in this case.