FRANK L. McCOY and ROBERT H. OLMSTEAD, Appellants, v. JAMES L. PAXTON and Others.

**Waters:** ACCRETIONS: DIVISION BY AGREEMENT. Accretion is the
1 gradual and imperceptible accumulation of land along the bank of a stream or body of water; and where adjoining landowners are each entitled to a portion of such accretions they may agree to a division of the same irrespective of their exact legal rights.

**Boundaries:** ORAL AGREEMENTS: POSSESSION: STATUTE OF FRAUDS.
2 An oral agreement fixing a division line between adjoining owners is not within the statute of frauds, where each takes possession

under the agreement with the knowledge of the other, regardless of the question of time; and such possession is sufficient if it clearly indicates an appropriation by the party who claims to own the property, without regard to personal occupancy, cultivation or improvement. In this action defendant's possession is held sufficient to uphold the oral agreement fixing the division line.

Same: ACQUIESCENCE. Acquiescence in a boundary line, with possession up to the same, for a period of ten years, is conclusive evidence of an agreement for its establishment.

*Appeal from Pottawattamie District Court.*—Hon. A. B. Thornell, Judge.

Tuesday, May 7, 1912.

The facts are stated in the opinion.—*Affirmed.*

*McCoy & Olmsted, S. H. Cochran,* and *Geo. S. Wright* and *Jacob Sims,* for appellants.

*Tinley & Mitchell,* for appellees.

Sherwin, J.—This is an action to quiet title. The land in controversy is all accretion made by the action of the Missouri river, which bounds it on the west. It all lies south of a line running due west to the river from the southeast corner of section 17, and is between the river and section 16 and 21. The plaintiffs are the owners of section 17, and the defendants are the owners of those parts of sections 16 and 21 that fronted on the river. Section 17 is a fractional section, consisting of lots 1 and 2. According to the government survey of 1852, the left bank of the Missouri river is meandered as commencing approximately at what would be the northwest corner of the N. E. ¼ of section 17, running thence diagonally in a southeasterly course, striking the easterly line of section 17 a short distance below what would be the southeast

corner of the N. E. ¼ of section 17, and continuing thence in a southeasterly direction. Lot 1, in section 16, is the tract of land that would have been, had the section been a full one, the N. W. ¼ of the S. W. ¼; and lot 2 of section 16 would have been the S. ½ of the S. W. ¼ of section 16. The meandered line of the left bank of the river continued diagonally to the southeast, cutting off the southwest corner of lot 1 in 16, leaving it with about thirty acres. Since the government survey in 1852, the Missouri river has gradually established itself about a mile west, and in doing so formed the land in controversy. The plaintiffs claim that all of the land in controversy is accretion to section 17, and, because thereof, that they own it all. The defendants claim, on the other hand, that the land is accretion to section 16, and, as special defenses, that the boundary was orally agreed upon and has been acquiesced in for more than ten years. Lot 2, in section 17, is the south tract in that section; and the south part of the east line thereof forms the west line of the northerly part of lot 1, in section 16. So it will be seen that lot 1 in 16 extends south of the extreme south end of lot 2 in 17. Lot 2 in 16 is south of lot 1 in that section.

John Hanthorn became the owner of lot 2 and a part of lot 1 in section 17 in June, 1866, and he owned this land until October 14, 1887, when he sold it to James F. Lyons. Mrs. Eliza J. Hough became the owner of lot 1 in section 16, June 21, 1866; and she retained ownership thereof until July 12, 1892, when she sold it to M. M. Marshall. Thus, from the 29th day of June, 1866, until October 14, 1887, John Hanthorn was the owner of lot 2, in section 17, and Mrs. Hough was the owner of lot 1 in section 16. James F. Lyons conveyed the land in section 17 to Edwin H. Walker and Marshall C. Hamilton in July, 1890 and in September, 1891, Edwin H. Walker conveyed to his minor son, Thomas H. Walker, his undivided one-half interest therein. In April, 1894, Hamil-

ton conveyed his interest in section 17 to J. B. Young; and in August, 1894, Young conveyed the same interest to Thomas H. Walker, who thus became the owner of all the land in section 17. In May, 1901, he conveyed to plaintiffs. The title to lot 1, in section 16, came to the defendants through conveyances from Mrs. Hough down. A part, if not all, of the land in controversy, and much more of the same kind north of it, had been formed when Hanthorn and Mrs. Hough became the owners of their respective lots in sections 17 and 16. Their lands were at that time heavily timbered; and as early, at least, as 1867, there was young timber on the land in controversy for some distance west of the meandered line of their lands.

In the fall of 1874, John Hanthorn and a son of Mrs. Hough located the southeast corner of section 17, and blazed a line from there due west as far as there was growing timber, which was six or seven hundred yards; and Hanthorn, at that time, stated that the line thus marked was the division line of the accretions to sections 17 and 16. In December, 1883, one Wallace Walker was cutting timber south of the line that had been marked by Hanthorn and young Hough in 1874, and Hough ordered him to stop. A few days later, Hanthorn and Hough agreed to have the line located by a surveyor, which was accordingly done; and it was found to be where they had themselves located it in 1874. The line was re-marked on trees, and corner stones were placed at both ends thereof. The line thus marked was open and visible when, in 1892, or 1893, a fence was placed there, which has since marked the division line. James F. Lyons, who was then the owner of the west half of lot 1 in 17, was present a part of the time while the survey of 1883 was being made. In 1887 the treasurer of Pottawattamie county sold the accretion land south of this line for the taxes of 1885-86, to James F. Lyons for the sum of $20.72; the tax certificate

describing the land as four forty-acre tracts in the S. E. ¼ of section 17—76—44. There was no such government description, however; and it is evident that Lyons was then attempting to acquire the title to the accretion land south of the Hanthorn-Hough line under the tax sale. When Marshall C. Hamilton and Edwin H. Walker bought lots 1 and 2 in 17 of Lyons in July, 1890, Hamilton understood that lot 2 and accretions did not extend further south than the line in question. And when Hamilton sold his undivided one-half interest in the land in 17 to J. B. Young in April, 1894, Hamilton advised Young that the south line of the accretion land was the fence in question. Young was not fully satisfied with Hamilton's statement; and, to determine certainly what claims were made to the accretion land by the occupants south of said line, Young went to Marshall, who had bought of Mrs. Hough and was then in possession, and talked the matter over with Marshall, who then told him that the fence marked the line that had been agreed upon years before; and that he made no claim to any of the accretion land north of it. The record shows, further, that when Lyons conveyed to Hamilton and Walker lots 1 and 2 in section 17, in July, 1890, he also assigned to them the tax certificate, covering the accretion land south of this line; and that after Hamilton had conveyed his interest in lots 1 and 2 to Young he still claimed to own an interest in the accretion land south of the fence, under the tax sale.

There is a great mass of evidence touching the question whether the land in controversy is accretion to both sections 17 and 16, or only accretion to section 17, as claimed by the appellants. The lapse of time has made it almost impossible to determine, with any degree of certainty, just how this land was formed, or to determine whether it is, in fact, all accretion to section 17, or

1. Waters: accretions: division by agreement.

accretion to section 16 as well. We have given the record a great deal of study, and we must confess that we are still in doubt as to the truth of the matter. The changes in the river were apparently great at the point in question before the government survey of 1852; and after that survey, and up until the cut-off of 1873, its vagaries are marked. The evidence of men who were fairly familiar with the river thirty or thirty-five years before this case was tried below is, in our judgment, of but little value in determining whether the land in question was gradually formed in such way as to become, in fact, accretion to both sections, or to only section 17. The landmarks left by the shifting channel may be fairly well defined; but accretion is the gradual and imperceptible accumulation of land, and it is, at best, in most instances a difficult matter to determine the precise point at which the increase started, or the exact course that it followed.

We shall not attempt to determine this branch of the case, for the reason that we are of the opinion that a division line was agreed upon as early as 1874, and re-affirmed in 1883, and because the parties in interest acquiesced in the present line for a period of more than ten years. And, in this connection, we should say that the appellees do not rely upon title by adverse possession, so that question is not before us. There is no question but what the land lying west of the meander line of sections 16 and 17 was accretion; and if a part thereof was believed to be properly accretion to section 16 the owners of the land in place to which the accretion belonged could undoubtedly establish the line between their accreted interests by agreement, or by acquiescence. The situation is, of course, a little different from that where a line between two surveyed tracts is in dispute, but the law of accretion gives to each riparian owner a part, at least, of the whole body accumulated by his own and the adjoining land; and where there is such an increase it is entirely competent

for the adjoining owners to agree how the accreted land shall be divided, and this is true regardless of the exact legal right that either may have therein.

An oral agreement, whereby a division line is established, is not within the statute of frauds, where the parties enter into possession, with the express or implied consent of each, and retain the same. Code, section 4626; *Kitchen v. Chantland,* 130 Iowa, 623; *Hays v. Marsh,* 123 Iowa, 84. A sale of real estate in parol, accompanied with possession is valid. *Chamberlin v. Robertson,* 31 Iowa, 408; *Tuttle v. Becker,* 47 Iowa, 486. And if such be the rule, it must follow that an oral agreement, fixing a division line, where possession is taken under the contract with the knowledge of the other party, is valid and final, regardless of the question of time. See, also, *Kitchen v. Chantland, supra.* There was a question between Hanthorn and Mrs. Hough as to their respective rights in this accreted land, and they selected their own way of determining such rights. And, after the lapse of more than thirty-five years, the courts should not indulge in technical refinements, which will result in setting aside this solemn agreement and in destroying property rights acquired thereunder.

*2. Boundaries: oral agreements: possession: statute of frauds.*

It is true that neither of these parties made valuable improvements on any of this land; and it is also true that their possession thereof was not such as would ordinarily follow where the land was under cultivation. But they were both in possession, to some extent nevertheless; and we think such possession was sufficient for the purposes of this case. A person may be in possession of land without a personal representative thereon, or without having personally cultivated or improved it. *Barstow v. Newman,* 34 Cal. 90. Possession of land may be acquired and held in different ways; and the possession is sufficient if it is such as to clearly indicate an appropriation by

the person who claims to hold the property. *Trayers v. McElvain*, 181 Ill. 382 (55 N. E. 135).

The primary purpose of possession is to notify the community or neighborhood that it is in the exclusive use and enjoyment of the person so appropriating the land. Here there was no question made as to possession or the right of possession until after the plaintiff's purchase in 1901; and at that time and for years before the land was cultivated. So far, then, as possession may be necessary to perfect an oral agreement establishing a division line, every element thereof was present in this case when plaintiffs became the owners of section 17 in 1901.

Moreover, plaintiffs' grantors had actual knowledge of the agreement respecting the division line, and recognized the rights of Mrs. Hough and her grantees thereunder.

3. SAME: acquiescence. Had there been no specific agreement, the evidence shows acquiescence in the line, accompanied by possession for a period of more than ten years; and this alone would be conclusive evidence of an agreement, and would bind the parties. *Miller v. Mills County*, 111 Iowa, 654; *Klinker v. Schmidt*, 114 Iowa, 695; *Kitchen v. Chantland, supra*. We think the learned district court rightly decided this case, and the judgment is *Affirmed*.