BEN F. CONKEY ET AL., APPELLANTS, V. HANS KNUDSEN ET AL., APPELLEES.

8 N. W. (2d) 538

FILED MARCH 5, 1943. No. 31217.

6

*George W. Leamer, M. R. Smith* and *S. W. McKinley, Jr.,* for appellants.

*D. Van Donselaar, Pizey, Sears & Pizey, W. P. Warner, W. V. Steuteville, P. F. Verzani, Richard Twohig* and *McCarthy & McCarthy, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

CARTER, J.

This is a suit brought by Ben F. Conkey to quiet title to certain accretive lands along the Missouri river in Dakota county. A default was entered against Hans Knudsen,

Jr., Clara Knudsen, Lewis W. Newman, Pearl M. Sanford, Maude Harris, Harry J. Goodfellow, Martha E. Goodfellow and all persons having, or claiming any interest in and to said lands, real names unknown. No appeal was taken from this decree and it has become final. On March 31, 1938, the defendants Hans Knudsen, Sene Knudsen, Maggie Leedom, Otis Wood and Jack L. Hamp having filed answers, the cause came on for trial as against them, and the court determined the case adversely to each and all of them. Defendant Jack L. Hamp did not appeal and the decree became final as to him. The other four defendants appealed to this court where the judgment against them was affirmed. The cause then came on for trial as to the interveners Brewer and George. The court thereupon permitted or directed all other "high bank" owners to file petitions in intervention with the result that the claims of all "high bank" owners to the whole of the alleged accretive area were before the court for determination. The trial court adjudged the area in question to be lands which accreted to the high bank and apportioned the lands to the high bank owners. All claims to the accretive area based upon adverse possession were also disposed of by the decree. From this decree the plaintiff and intervener Henry Francisco have appealed. Interveners Wood, Christensen and the heirs of C. K. Heffernan have cross-appealed. Interveners George, Brewer and Goodfellow are appellees. The rights of all high bank owners in the accretive area are therefore properly before this court for final disposition.

Various phases of this case have been before this court on previous occasions. *Conkey v. Knudsen,* 135 Neb. 890, 284 N. W. 737; *State v. Ryan,* 136 Neb. 334, 285 N. W. 923; *Conkey v. Knudsen,* 141 Neb. 517, 4 N. W. (2d) 290. The matter is now before us after oral argument on the motions for a rehearing filed after the last of the foregoing opinions was adopted and released by this court. The correctness of our opinion in *Conkey v. Knudsen,* 141 Neb. 517, 4 N. W. (2d) 290, must therefore be first determined. All

references in this opinion to a map of the area involved in this litigation are to exhibit 105, which was reproduced in our last preceding opinion and will not be included in this opinion except by reference.

The first question to be determined is whether the area between the high bank and the present location of the Missouri river is an accretive area. The case was tried in the lower court on the theory that the lands in question had accreted to the high bank. The issues as shown by the pleadings were also on the theory that these lands were accretions. This court in its former opinion, *Conkey v. Knudsen*, 141 Neb. 517, 4 N. W. (2d) 290, disregarded the issues made up by the pleadings, rejected the theory of the parties in the trial court, and arrived at an independent conclusion from the evidence that the lands were the result of an avulsion and consequently did not accrete to the high bank.

An examination of the map will show the present location of the Missouri river. A hatched line identified by the letters A, B, C, D, etc., marked "high bank," extending from section 11, township 29, range 7 southeasterly to section 24, township 29, range 8, indicates the west bank of the Missouri river as it existed in the spring of 1910. The western portion of this high bank was in existence long prior to 1910 because the evidence shows that in 1857 the original high bank continued on south when it reached section 24, township 29, range 7, as shown on the map. There is no disagreement, however, that in 1910 the Missouri river ran along the high bank first described, that the water was deep and the current swift, and constituted a main channel of the river.

The evidence shows clearly that the alleged accretive area was an alluvial formation or "river-made" land. The lands in existence in the area at the time of the original government survey had all been washed away by the action of the river. The survey shown on the map is merely a reproduction of the old original survey lines on this newly formed alluvial soil.

The Missouri river at this point is a shifting stream, the current changing from one position to another over an area of several miles throughout the years. While much land, surveyed under the original government survey, has been entirely washed away and replaced by alluvial soil, or has become a part of the new river bed, there is also the then existing river bed of the river itself to be considered.

In our opinion, the evidence shows that the vegetation growing within the area has made its growth since 1910. In that part lying east of the high bank and west of the slough designated on the map as the first chute east of the high bank, there was a natural growth of willows and cottonwood trees where no clearing had been done. Several witnesses said that there were good-sized cottonwood trees in this area and one witness estimated that some must have been two feet in diameter at the time of trial. In view of the evidence that this area was under water in 1910, we are unable to say that the existence of these trees, growing under the most favorable conditions, disparages the claim that it was alluvial soil which accreted at or after that time. That part of the area east of the chute and west of the river is low marshy land grown up to willows and young trees admitted to be of very recent growth.

The evidence shows that in the early spring of 1910 an ice gorge formed a short distance north of the north line of section 13, causing the river to completely cover the area east of the high bank. When the river receded it followed a course farther east of the high bank. This changing of the course of the stream is the basis upon which we determined in our former opinion that the area was the result of an avulsion. The record does not disclose from what land, if any, the area was cut off by avulsion, or the situation existing from which it might be reasonably inferred that it could be identified as the same land that had washed away from some other surveyed tract or plot marked out on the ground. Whether the river returned to an old channel or carved out a new one is not shown. No persons have appeared claiming ownership on the theory that an avul-

sion occurred in the spring of 1910. There is evidence that after the high water of 1910 said lands were connected to the high bank by additional alluvial deposits. The testimony of all the witnesses familiar with the country is that the alluvial soil was accretive land. Some contention is made that it was river-bed land which had accreted to the high bank by the filling in of alluvial deposits which appeared as the water gradually receded. But we do not think this distinction is important, as the rules governing accretions would be applicable in any event. The term "batture" is frequently applied to such alluvion. It is defined as "an elevation of the bed of a river under the surface of the water; but it is sometimes used to signify the same elevation when it has risen above the surface." 'Bouvier's Law Dictionary. In fact, a batture is a filling in of the stream of water from the bottom. During the early stages it appears as a growth, slowly filling from the bottom, and as it continues to grow it ultimately forms an island. In any event it is a form of an accretion and the title thereto becomes the property of the owner of the original bank. Its accretion will generally go to the owner of the bank to which it is attached. Clark, Surveying and Boundaries (2d ed.) sec. 294, note 4.

Avulsion is the sudden and rapid change in the course and channel of a boundary river. In *Nebraska v. Iowa,* 143 U. S. 359, 12 S. Ct. 396, it was said: "It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion."

An accretion to land is generally defined as the imperceptible increase thereto on the bank of a river by alluvial formations, occasioned by the washing up of the sand or earth, or by dereliction as when the river shrinks back below the usual watermark; and when it is by addition it

should be so gradual that no one can judge how much is added each moment of time. *Lammers v. Nissen,* 4 Neb. 245; *Frank v. Smith,* 138 Neb. 382, 293 N. W. 329. Webster's New International Dictionary defines it as follows: "The increase or extension of the boundaries, or the acquisition, of land by the gradual or imperceptible action of natural forces, as by the washing up of sand or soil from the sea or a river, or by a gradual recession of the water from the usual watermark." We think the evidence shows, in accordance with these holdings, that the ice gorge in 1910 obstructed the channel of the river and caused the waters to spread out over this alluvial area and to slow up the velocity of the current, thereby causing heavy deposits of alluvion to be formed in this area. As the river gradually subsided, the alluvial deposits made their appearance. The gradual recession of the water thereby left such deposits as accretions to the lands of the high bank owners. The fact that the river sought a different channel as the waters receded is not of itself sufficient to sustain a finding that an avulsion occurred. The facts warrant the application of the rule announced in *Frank v. Smith, supra,* as follows: "Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner."

In *Kinkead v. Turgeon,* 74 Neb. 580, 109 N. W. 744, this court aptly stated: "Along the Missouri river the change of the bed to dry land in the case of accretion is sometimes even more rapidly performed than the changes of the abandoned bed to dry land in the case of avulsion, for in such case the abandoned bed is usually full of water, which gradually evaporates, and which in many instances forms lakes which stand for years, occasionally filled again by the river in flood periods, a number of these 'cut-off lakes,' as they are locally termed, extending from three to eight or ten miles long and occupying practically the whole of the abandoned bed for many years."

We are convinced from a careful reading of the record that a finding that an avulsion occurred cannot be sustained and that all the facts and circumstances shown substantiate the finding of the trial court that the alluvial area in question was in fact accretive lands belonging to the high bank owners.

It will be observed from the map that the accretive area is a very irregular tract. The Missouri river borders it on the north and east while the high bank borders it on the west and south. Any attempt to divide the accretive area by the usual rule would confront us with difficulties beyond a reasonable and equitable solution. Interveners George, Brewer and Goodfellow own sections of the high bank along the north sides of their deeded lands, while plaintiff and the interveners Francisco, Wood, Christensen and the Heffernan heirs own sections of the high bank along the eastern boundaries of their lands. Extensions of the boundaries in the usual manner would cause overlaps and confusing claims. A general rule cannot be followed in dividing accretions under all conditions. All of the surrounding circumstances must be considered in applying any rule of division. Clark, Surveying and Boundaries (2d ed.) sec. 274. The courts, in the division of alluvial rights, must make an equitable division thereof between all the riparian owners of the high bank where the circumstances are such that the general rule cannot be made applicable. Where the general course of the river is much curved, either outwardly or inwardly, or, where the general course of the original bank is likewise irregular, the boundary lines within which the riparian owner is required to confine himself in reaching the thread of the stream must necessarily be either divergent or convergent, according as the river boundary is longer or shorter than the original river bank line. In such cases the better rule is that the frontage of each riparian owner on the new river bank should be divided in proportion to his frontage on the original bank. This is the method the trial court attempted to apply, and we think it is correct.

An able writer has stated the rule as follows: "The courts are frequently called upon to partition the alluvial deposits, flats, dock privileges, made land, and similar rights. The division of such rights among riparian owners has been a fruitful source of litigation and the courts have promulgated certain rules for the partition thereof, which have been exceedingly useful to the professions. Among such rules we find the following: 1. Measure the ancient bank and compute the number of feet owned by each proprietor. 2. Divide the new bank into as many equal parts as there were feet in the old bank and draw lines from the old points of division to the new ones." Clark, Surveying and Boundaries (2d ed.) sec. 251. As early as 1835 the supreme court of Massachusetts applied the foregoing rule in the following language: "The rule is, 1. To measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards or feet, each riparian proprietor owned on the river line. 2. The next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly formed bank or river line into 200 equal parts, and appropriate to each proprietor as many portions of this new river line, as he owned rods on the old. Then, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old, to the points thus determined as the points of division on the newly formed shore. The new lines, thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds or falls short of the old." *Deerfield v. Arms,* 17 Pick. (Mass.) 41. See, also, *Kehr v. Snyder,* 114 Ill. 313, 2 N. E. 68; *Smith v. Johnson,* 71 Fed. 647 (Neb.). The trial court complied substantially with this rule in dividing the accretive lands in the instant case. The result was that, in determining the respective interests of the parties to the accretive lands, the boundary lines of the high bank owners were extended to the present west bank of the Missouri river at an angle of 47 degrees and no minutes east. Complaint is made of

the fact that the division lines were parallel when the survey shown on the map indicates that the high bank and new bank bounding the accretive area were not the same length. There is sufficient merit in this contention to warrant our consideration of the subject. It can readily be seen that a proper apportionment of the accretive area in accordance with the rule we have herein announced could not be made with division lines parallel with each other. However, the difference is relatively small and by far the greater part of the loss of land caused thereby falls upon the interveners George, Brewer and Goodfellow, who appear in this court as appellees asking that the division made by the trial court be affirmed. The plaintiff Conkey and the interveners Wood, Christensen and the Heffernan heirs are not injured for the reason that their claims are based on title by adverse possession, their rights to accretions being lost by the adverse possession of others, and could not be affected by a change in the lines dividing the accretive area. The division made by the trial court is advantageous to Henry Francisco and he would therefore have no basis for complaint. It must be borne in mind that the measuring of the high bank and of the present new bank of the river requires the exercise of judgment where indentations or projections are encountered. The purpose of the rule is to provide an equitable division among the high bank owners. Accuracy in such case is a desired end, difficult of attainment. We are convinced, under the circumstances shown, that all appellants and cross-appellants have received an equitable apportionment, even though the rule announced was not strictly followed. This is particularly true in view of the fact that the appellees, the only parties to the litigation injured thereby, are not complaining.

The contention is advanced that the trial court erred in holding that owners of land in sections 20, 21 and 22, township 29, range 8, were entitled to any of the accretive area for the reason that the original high bank extended south in section 24, township 29, range 7, as shown on the map,

and that all lands in question accreted to this old high bank and not to the high bank running east through sections 20, 21 and 22. There is no merit to this claim. The record shows that the Missouri river was located approximately in its present position in 1905. All lands in this area lying south of Union county, South Dakota, and south of the middle of the main channel of the Missouri river as it existed in 1905, became a part of the state of Nebraska, irrespective of its previous history. 33 U. S. St. at Large, 820, ch. 1295. All South Dakota lands in this area which were south of the thread of the river as the result of avulsions prior to 1905 thereby became a part of Nebraska. There is no evidence that would warrant our holding that any part of the accretive area was not a part of and accreted to the Nebraska shore since the fixing of the boundary in 1905. In 1910, however, the river was running along the old high bank until it reached section 24 and then ran in an easterly direction as shown by the map. The lands in sections 20, 21 and 22, whatever may have been their previous history, were then owned by interveners Goodfellow, Brewer and George, or persons from whom they obtained title. When the river cut across these lands, the interveners named became riparian owners and entitled to any accretions to their riparian lands. Consequently, the trial court was right in including the high bank running through sections 20, 21 and 22 as a boundary of the accretive area involved in this suit.

Appellant Conkey complains of the orders of the trial court permitting or directing the intervention of all other high bank claimants to the accretive lands. It is his contention that, the trial having commenced, other interested persons could not then be made parties under the provisions of section 20-328, Comp. St. 1929. We agree that intervention could not be had as a matter of right under this statute after the trial had commenced, but we know of no rule to prevent the trial court from permitting or requiring interested persons to be made parties to the litigation after trial had commenced. This is particularly true

where the case, by stipulation, is not all tried at the same time. It does not appear from the record that any plaintiff, defendant or intervener was deprived of any right to prosecute his claim or defend against the claims of adverse parties. The suit was equitable in its nature and we think the trial court was justified in requiring all claimants to this accretive area to come into court and present their claims in order that the whole accretive area might be divided among its riparian owners in one suit. The avoidance of a multiplicity of suits alone warrants the action taken by the trial court.

Appellant Conkey also contends that the trial court in a previous decree in the same case had held that he owned the lands described in his petition by adverse possession and that this court affirmed such decree on appeal. An examination of our opinion in deciding that case, *Conkey v. Knudsen*, 135 Neb. 890, 284 N. W. 737, will not sustain this contention. It is true that we said in that opinion that, when appellant Conkey sold the south half of the north half of section 13 to the cross-appellant Christensen, he retained possession of the accretions thereto, but no attempt was made to define the boundaries of this accretive land. And in the case of *State v. Ryan*, 136 Neb. 334, 285 N. W. 923, we did not say that appellant Conkey had a title by adverse possession which would be absolute. What we did say was that he had a *prima facie* title against the squatters on the land because of his ownership of the riparian lands adjacent thereto which entitled him "to the possession of the lands until a superior right is adjudicated to be in some other person." If the decree had adjudicated title in appellant Conkey by adverse possession, a title paramount to all other claims, there would have been no occasion for the use of this language directly antagonistic to any such title. We cannot agree therefore that appellant has a previous adjudication of his rights to accretions as a riparian owner or growing out of an adverse possession for the statutory period.

Appellant Conkey claims that interveners Goodfellow,

Brewer and George have no claims superior to his claim. We think they have by virtue of their right to the accretions as shown on the map, exhibit 105, except where such riparian right to accretions has been lost by Conkey's adverse possession.

Cross-appellant Peter E. Christensen contends that he is entitled to certain accretions by virtue of his ownership of the high bank in the southwest quarter of the northeast quarter of section 13, as shown on the map. The record shows that this cross-appellant disclaimed in open court any interest in any accretions other than those decreed to be in him by the trial court. The trial court properly held that the possession of Conkey and the disclaimer of Christensen was sufficient to defeat the claim of Christensen, except as shown in the trial court's decree.

The cross-appellant Otis Wood complains of the decree of the district court as to him for the reason that he is deprived of access to the river. There is no merit to this claim. We are familiar with the rule that entitles a riparian owner to access to the stream. But such right is one that can be lost by adverse possession, the same as any other right in real property. Wood has lost title to that part of his accretive lands bounded by the present bank of the river because of the adverse possession of the appellant Henry Francisco. The lands awarded him by the decree became his by virtue of his adverse possession for the statutory period. Wood is therefore in no position at this time to invoke the rule for which he contends.

We have examined the claims of all persons to the litigation and we have come to the conclusion after an examination of the evidence that the trial court, to the extent that division was made among the high bank owners, was correct. All claims of title by adverse possession sustained by the trial court are amply supported by the evidence.

The trial court made no disposition of the accretive lands shown on the map as lying east of the first chute and west of the Missouri river, excluding that part awarded to James P. Goodfellow, or any lands south or east of it. We think

18

the title to this land, shown on the map as parts of sections 12, 8 and 9, is in Henry Francisco by virtue of his adverse possession for the statutory period, and under the record in this case the decree should have so provided. We therefore direct the trial court to enter a supplemental decree awarding the title to these lands to the appellant Henry Francisco.

Complaint is made to the taxing of the costs. The costs of the first trial between Conkey on the one hand and the defendants Hans Knudsen, Sene Knudsen, Maggie Leedom, Otis Wood and Jack L. Hamp on the other, are hereby taxed against the named defendants. The costs of the first appeal to this court are hereby taxed against the defendants Hans Knudsen, Sene Knudsen, Maggie Leedom and Otis Wood. It is further ordered that the parties to the second trial pay their own costs in the district court and in this court on appeal.

The motion to strike the cross-appeal of Peter E. Christensen is hereby overruled. In view of the decision reached, the motion of the appellant Conkey for a clarification of our former opinion, *Conkey v. Knudsen*, 141 Neb. 517, 4 N. W. (2d) 290, is also overruled.

We conclude that our former opinion, *Conkey v. Knudsen*, 141 Neb. 517, 4 N. W. (2d) 290, is in error and the same is hereby vacated. The decree of the district court is hereby affirmed as modified.

AFFIRMED AS MODIFIED.

ROSE and EBERLY, JJ., not participating.