DOROTHY ROTH SWANSON, APPELLEE, v. HARLEY A. DALTON ET AL., APPELLANTS.

131 N. W. 2d 704

Filed December 18, 1964. No. 35752.

Merritt C. Warren and Jewell & Otte, for appellants.

Duane K. Peterson and Henry F. Reimer, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, and BROWER, JJ., and ROBERT L. FLORY and ROBERT L. SMITH, District Judges.

WHITE, C. J.

This is an action to establish boundaries, under section 34-301, R. R. S. 1943, between adjoining riparian owners of accretion land along the Missouri River in

Knox County, Nebraska. The land in dispute is a short distance west of the confluence of the Niobrara and the Missouri Rivers.

Aerial photographs, surveys, and plats prepared from the records were introduced in evidence. From them an approximate composite picture may be put together as to the development of the accretion land involved since 1863, the time of the original government survey. This includes the results of a government survey of 1917 which established the shoreline and the extent of the development of deeded accretion land to that date.

A sketch, prepared from the various exhibits and the evidence, is included herein for illustrative purposes and appears on the following page. The railroad track gives a rough approximation of the shoreline of the Missouri River in 1863 at the time of the original survey. Bluffs and high ground are generally parallel and south of these tracks. The plaintiff's deeded land, including the triangular Tract A of deeded accretion land, is in Section 1, Township 32 North, Range 7 West. The defendants' deeded patented and deeded accretion land lies in Sections 6 and 7, Township 32 North, Range 6 West, immediately to the east. It appears from the evidence that at the time of the original survey in 1863, the river frontage in these adjoining sections was approximately equal. The 1917 survey established that the Missouri River had moved gradually north. The shoreline had become irregular. This movement north, until 1917, was almost entirely in Section 1, the plaintiff's land. An inspection of the 1917 shoreline shown on the sketch will demonstrate this. After the 1917 survey, the plaintiff's predecessors in title became the owners of deeded accretion land shown as triangular Tract A on the sketch. Defendants' predecessors in title also became the owners of deeded accretion land in Sections 6 and 7 immediately to the east. The issues in this case arise from a dispute as to the division of the land accreting to the north and the east since these acquisitions. This is the land in

Tracts B, C, and D as shown on the sketch. This land has accreted since the 1917 government survey. The 1957 bank of the Missouri River is shown on the sketch as scaled from exhibit 3 which is an aerial photograph. The 1960 bank shown on the sketch roughly parallels the bank as shown in exhibit 6, a plat, and exhibit 10, an aerial photograph of the bank in 1961.

The issues were narrowed further by the parties. Defendants concede the ownership in plaintiff of the accretion land in Tract B on the sketch which comes east to the section or township line. The accretion land in Tract D is conceded to belong to the defendants. The disputed Tract C is approximately 76 acres in area. The east line of this disputed area in Tract C is a line drawn from a point on the 1957 river bank. This point represents and fixes the same proportionate ownership on the new bank (1957), that existed on the 1917 shoreline which was the border of the deeded accretion land. This point was joined to a meander corner on the section line forming the original boundary between the parties and marked "meander corner set 1917," as seen on the sketch. This line runs 44 degrees, no minutes, north and east of the section or township line. As seen from the sketch, this estabilshed a boundary line dividing the property based upon a proportionate ownership in the plaintiff of 4830/9290 of the 1917 shoreline of the property and 4460/9290 of the 1917 shoreline in the defendants. We note that this line establishes an approximately equal division of the shoreline and, although no precise measurements are available, appears to be fairly close to the division of the shoreline as it existed in the 1863 government survey.

The plaintiff's petition alleged and sought to establish the boundary line above described and indicated on the sketch. The district court in its decree so established the boundary line. In so doing, it followed substantially the rule laid down by this court for the division of ac-

cretion land set out in Conkey v. Knudsen, 143 Neb. 5, 8 N. W. 2d 538.

The defendants, on appeal, contend: (1) That the method of division of the accretion land involved in this appeal should be by extending the section lines between the property, (2) that the boundary on the section line was established in about 1955 by consent and agreement of the owners, (3) that the mutual recognition and acquiescence in that line has been the boundary since 1955, and (4) that the plaintiff is estopped from asserting rights to the accretion land in question by reason of laches or otherwise.

We think the apportionment rule applied by the district court was correct. Defendants dispute the method or principle used in accomplishing the division and not the selection of points or the measurements made if the rule followed is applicable. In Conkey v. Knudsen, *supra,* this court had quite a similar situation with reference to accretion land on the Missouri River before it. Therein we said: "Where the general course of the river is much curved, either outwardly or inwardly, or, where the general course of the original bank is likewise irregular, the boundary lines within which the riparian owner is required to confine himself in reaching the thread of the stream must necessarily be either divergent or convergent, according as the river boundary is longer or shorter than the original river bank line. *In such cases the better rule is that the frontage of each riparian owner on the new river bank should be divided in proportion to his frontage on the original bank.* This is the method the trial court attempted to apply, and we think it is correct. * * * 'The new lines, thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds or falls short of the old.' * * * The trial court complied substantially with this rule in dividing the accretive lands in the instant case. The result was that, in determining the respective interests

of the parties to the accretive lands, *the boundary lines of the high bank owners were extended to the present west bank of the Missouri river at an angle of 47 degrees and no minutes east.*" (Emphasis supplied.)

In 1917 the river border was irregular and concave. This, of course, roughly and approximately marked the border of the original deeded accretion land about which there is no dispute. The issue is drawn as to the accretion land that has developed since by the outward movement of the river. The river, by gradual and imperceptible changes in the shoreline, has gone to the north and east and now has a slight convexity as it flows to the southeast. Following the principle above announced in Conkey v. Knudsen, *supra,* the accretion land forming in between should be divided in proportion to the ownership on the old bank. No decided projections or indentations appear that should alter the application of the rule. We point out that in this case that the final result reached gives both parties approximately equal ownership on the shoreline.

Defendants argue for an extension of the section line boundaries and an equal division of accretion acreage. They complain of the fact that the plaintiff acquires a total of 403 accretion acres since the time of the original 1863 survey and the defendants are left with only 137 acres. But, 256 acres of plaintiff's land is deeded accretion land that she became the owner of and occupied pursuant to the 1917 government survey. The defendants do not question the ownership of the plaintiff to this property. The situation that arose here came about because the river happened to move to the north of the plaintiff's land much further and at an earlier time leaving the situation shown on the sketch by the 1917 government survey line. An equal division of all accretion acres would result in a situation where the defendants would be the owners of a portion of the plaintiff's deeded accretion land and result in the practical elimination of the plaintiff's shoreline on the Missouri

River. Such a result, of course, would obviously be inequitable. There are many rules for the division of land accreting to a shoreline. But, one basic principle is that no regard is necessarily to be paid to the direction of preexisting side lines between contiguous proprietors, the reference is ordinarily entirely to the shoreline. See 56 Am. Jur., Waters, § 494, p. 906. An inspection of the sketch will further show that the application of a rule to extend the section line would reduce plaintiff's shoreline to a very short frontage on the river. This again would not be equitable. It is conceded that no precise rule has ever been developed that will accomplish complete justice in any mathematical sense. The evidence here gives a general picture of the historical development of the river and the accretion land. There is uncertainty as to a number of different points. An attempt to recapture this history in any precise sense is impossible. The application of the rule in Conkey v. Knudsen, *supra*, gives the parties substantially comparable and equal portions of the shoreline, which is about what they had originally under the 1863 government survey. We think the trial court was substantially correct in selecting the principle of division applied in this case. The application of the principle, as to the points selected and the measurements involved, is not questioned in this appeal. There is no merit to the first contention of the defendants.

Defendants contend that there was an oral agreement in February 1955 between the owners fixing the boundary on the section line. The parties may agree upon their respective interests in accretion adjoining their lands and fix the boundary lines by agreement, regardless of their exact legal rights. Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737, citing McCoy v. Paxton, 156 Iowa 194, 135 N. W. 1091. But, in order that a boundary line may be established by a parol agreement, a mutual intention of the parties to determine the boundary line must be shown. Kennedy v. Gottschalk, 138

Neb. 842, 295 N. W. 813. See, 11 C. J. S., Boundaries, §§ 68, 69, p. 642; 8 Am. Jur., Boundaries, § 73, p. 797; 12 Am. Jur. 2d, Boundaries, § 78, p. 614.

In February 1955, Charles Dalton, now deceased, the then owner and defendants' predecessor in title, had a survey made of the section line between Sections 1 and 6 at his own expense. At that time, the plaintiff and Otto Swanson, her husband, were the joint owners of plaintiff's land in Section 1. Otto Swanson and Charles Dalton were both dead at the time of the trial. Neither Otto Swanson or the plaintiff were present or participated in the survey in February 1955. The record is entirely void of any proof of a parol agreement as to a boundary line or a survey as between the owners at that time. On the morning of the survey, there was a conversation between Charles Dalton and Otto Swanson. There is no evidence as to the nature of that conversation. Later on, when the survey was being made by one Chester Anderson, there is testimony that the sons of the plaintiff, Jerre and Richard Swanson, were present at least a part of the time. Whether they were onlookers or participated in the survey is not certain from the record. Neither one of the sons testified as to any agreement as to a boundary line or as to a survey. We summarize this testimony by saying that the only inference that could be drawn from it is that the then owners of the property knew that a survey was being made and that they probably knew that the sons were present. It is true that there is evidence that Charles Dalton's purpose in making the survey was to establish a boundary line between the properties. The trial court heard the testimony, saw the witnesses, and specifically found in its decree that there was no agreement between the parties as to the accretion land or a boundary line. This finding is not only supported by the evidence but we feel the evidence would be insufficient to support a contrary finding.

The defendants argue that the plaintiff by her con-

duct assented to and acquiesced in the boundary line as being the section line, and that she is estopped to deny otherwise. After the survey of 1955, Charles Dalton, the then owner, built a fence part way down the section line from the Missouri River shore. Jerre Swanson told the defendant, Harley Dalton, that he would not complete this fence because they should have more land. It was completed in 1959 by Harley Dalton. It is true that the plaintiff or her predecessors in title never farmed east of the section line. But, until the fence was completed they pastured cattle in that area. Through the years preceding 1957, this land was generally full of willows, and vegetation, and was marshy. In 1957, the defendants leased the disputed acreage to one Owen Coutts to clear and farm, but the agreement provided that this was to be done at Coutt's own risk as to title. Defendants placed a shack on the property. Jerre Swanson sold them seed corn for use on the property and there is much other evidence as to acts that the defendants performed by which they asserted ownership and title in this property. We summarize this evidence by stating that its effect is to show that defendants occupied the disputed acreage exclusively as their own since 1955, and that they did so to the plaintiff's full knowledge. This would be for a period of about 6½ years prior to the bringing of this action. It is clear that title by adverse possession could not have been acquired. Did the defendants acquire title by acquiescence and recognition under the statute? The statute by its terms declares: "* * * that such (boundaries) have been recognized and acquiesced in by the parties or their grantors *for a period of ten consecutive years.*" See § 34-301, R. R. S. 1943. In Hakanson v. Manders, 158 Neb. 392, 63 N. W. 2d 436, where a party occupied land up to a row of trees that he had planted, this court said: "It will be noted from the foregoing that recognition of and acquiescence in a boundary line to be binding, in the absence of an agreement determining the same, re-

quires mutuality of recognition and acquiescence by the parties. *It partakes of the nature of an estoppel* and, under our statute, *it must exist for a period of 10 consecutive years."* (Emphasis supplied.) See, also, Kennedy v. Gottschalk, *supra.* The evidence in this case does not establish mutual recognition and acquiescence, and if it did, it has not existed for a period of 10 consecutive years. The most that it shows is knowledge of adverse possession for about 6½ years. The trial court found that no boundary line was established by acquiescence or recognition, and we agree.

Defendants assert that, even if the statutory period has not run, plaintiff is estopped from asserting her title and is guilty of laches. This contention overlaps the previous ones. The testimony herein establishes the adverse possession and enjoyment of the disputed acreage by the defendants. It establishes a failure of the plaintiff to dispute the use of the land. It does not establish any false statements or concealment of the plaintiff owner or her husband predecessor in title, Otto Swanson. The defendant, Harley Dalton, in making the lease of this land to Owen Coutts recognized the uncertainty of the title. Coutts was told he made the improvements (clearing the land) at his own risk. The evidence shows that the defendants were aware of the uncertainty of their title but were aggressive in asserting it. They did not rely on it even when they made the lease to Coutts. Title to real estate may not be created by estoppel ordinarily. The mere failure to dispute the use of land or bring an action to eject an adverse possessor is not sufficient to defeat title, or to bring into operation the doctrine of estoppel or laches. Lehman v. Smith, 40 S. D. 556, 168 N. W. 857; 11 C. J. S., Boundaries, § 76, p. 649. The statutory periods may not be shortened. Silence or acquiescence does not shorten the required period. And, as we have already pointed out, our court has said that if an estoppel occurs by mutual recognition and acquiescence, it must be in

existence for 10 years. Hakanson v. Manders, *supra.* Defendants cite Roll v. Martin, 164 Neb. 133, 82 N. W. 2d 34. This case is not in point because there the owner positively misrepresented a boundary line, and the misrepresentation was relied upon by a third party. A party may not base a claim of estoppel in his favor on his own wrongful acts or derelictions of duty or on acts or omissions induced by his own conduct. Estoppel must arise as the result of misrepresentations of the party against whom the estoppel is claimed. Armbruster v. Stanton-Pilger Drainage Dist., 169 Neb. 594, 100 N. W. 2d 781; 11 C. J. S., Boundaries, § 72, p. 646.

On a review of the evidence we can find nothing in this case to bring the plaintiff's actions and conduct within the actionable principles of estoppel. Plaintiff may not be denied her rights simply by reason of her failure to object to the defendants' aggressive assertion of their claim of ownership. The judgment of the district court is correct and is affirmed.

AFFIRMED.